**WORTHINGTON FEDERAL BANK and Worthington Financial Holdings, Inc., Plaintiffs,**

v.

**EVEREST NATIONAL INSURANCE COMPANY and Security National Insurance Company, Defendants.**

No. 5:14–cv–0244–JEO.

United States District Court, N.D. Alabama, Northeastern Division.

Signed June 4, 2015.

**1214**

James S. Williams, Marcus Monte Maples, Sirote & Permutt P.C., Birmingham, AL, for Plaintiffs.

Archibald T. Reeves, IV, McDowell Knight Roedder & Sledge LLC, Mobile, AL, Brian A. Dodd, Krebs Farley & Pelleteri, Birmingham, AL, Jeffrey S. Price, Justin D. Wear, Manier & Herod P.C., Nashville, TN, for Defendants.

### MEMORANDUM OPINION & ORDER

JOHN E. OTT, United States Chief Magistrate Judge.

In this action removed from Alabama state court, Plaintiffs Worthington Federal Bank (the "Bank") and Worthington Financial Holdings, Inc. ("WFH") (collectively "Plaintiffs" or the "Companies") bring claims under Alabama law for breach of contract, the tort of bad faith, and for a declaratory judgment against Everest National Insurance Company ("Everest") and Security National Insurance Company ("Security National") (collectively "Defendants"). (*See* Doc.[1] 21, Amended Complaint (hereinafter "Complaint" or "Compl.")). The case was assigned the undersigned pursuant to the court's general order of reference dated January 14, 2013, and the parties have consented to an exercise of plenary jurisdiction by a magistrate judge under 28 U.S.C. § 636(c) and

FED.R.CIV.P. 73. (Doc. 31). The cause now comes to be heard on a motion for summary judgment filed by Security National (Doc. 35) and a motion for partial summary judgment filed by Everest. (Doc. 37). The parties have filed evidence and fully briefed their respective positions on the motions. (Docs. 36, 38, 40, 41, 42, 43). Upon consideration, the court concludes that Everest's motion for partial summary judgment is due to be denied and that Security National's motion for summary judgment is due to be granted in part, as it relates to its duty to advance defense expenses for an underlying action pending in state court.

### I. BACKGROUND

For purposes of the instant summary judgment motions only, the parties have stipulated to the following facts (*see* Doc. 32 at 2–4):

1. Everest issued Directors & Officers Liability Policy Number 8100000269–121 for the policy period of December 14, 2012 to December 14, 2013 (the "Everest Policy").

2. Security National issued Directors & Officers Liability Policy Number SDO1108069 for the policy period of December 14, 2013 to December 14, 2014 (the "Security National Policy").

3. The terms of the Everest Policy and the Security National Policy and no other insurance agreement govern the dispute among the Parties.

4. Plaintiffs are insureds under the Everest Policy and the Security National Policy.

---

1. References herein to "Doc(s).____" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files system. Unless otherwise noted, pinpoint citations are to the page of the electronically filed document, which may not correspond to pagination on the original "hard copy."

5. On February 6, 2013, Judy Worthington filed suit against Plaintiffs and certain of their employees, officers and/or directors in the Circuit Court of Madison County, Alabama (the *"Worthington* Lawsuit").

6. On April 4, 2014, Stephen Brewer and others filed suit against Plaintiffs and certain of their employees, officers and/or directors in the Circuit Court of Madison County, Alabama (the *"Brewer* Lawsuit"). Plaintiffs provided Security National with notice of the *Brewer* Lawsuit on April 9, 2014, and Everest with notice of the *Brewer* Lawsuit on April 16, 2014. Solely for purposes of the Preliminary Summary Judgment Motions, neither Everest nor Security National will argue that notice of the *Brewer* Lawsuit was untimely.

7. Plaintiffs contend that they have met every condition precedent to coverage under the Security National Policy and the Everest Policy. Plaintiffs assert that one or both Policies should provide defense costs and coverage for the *Brewer* Lawsuit.

8. Everest asserts that the *Brewer* Lawsuit is deemed to be a claim first made during the Security National Policy period and is not related to the *Worthington* Lawsuit.

9. Security National asserts that the claims and allegations in the *Brewer* Lawsuit are Interrelated Wrongful Acts (as defined under the Security National Policy) with the claims and allegations in the *Worthington* Lawsuit and is deemed to have been made during the Everest Policy period.

10. Everest asserts that the *Brewer* Lawsuit is not covered under the Everest Policy because, *inter alia,* the claim was not made during the Policy Period.

11. Security National asserts that the allegations in the *Brewer* Lawsuit are related to claims first made during the Ever-

est Policy period. Security National also asserts that the *Brewer* Lawsuit is not covered under the Security National Policy because, *inter alia,* (a) it is an Interrelated Wrongful Act (as defined under the Security National Policy), (b) it is deemed to have been first made no later than the date when the *Worthington* Lawsuit was filed pursuant to Section III.B. of the Security National Policy, and (c) Exclusion A.1 of the Security National Policy excludes coverage for the *Brewer* Lawsuit.

The parties have further stipulated that it is appropriate for the court to consider the following documents in ascertaining whether summary judgment is due to be granted (*see* Doc. 32 at 4–5):

1. The Everest Policy (Doc. 38–1);

2. The Security National Policy (Doc. 36–1, Doc. 38–2);

3. Plaintiffs' Application for the Security National Policy dated December 11, 2013 (Doc. 36–7);

4. The pleadings (including the Complaint) in the *Worthington* Lawsuit (Doc. 36–2, Doc. 38–3 (*"Worthington* Complaint" or *"Worthington* Compl."));

5. The pleadings (including the Complaint) in the *Brewer* Lawsuit (Doc. 36–3, Doc. 38–4 (*"Brewer* Complaint" or *"Brewer* Compl.")).

## II. SUBJECT MATTER JURISDICTION

■■■■ Before considering the merits of the summary judgment motions, it is necessary to address subject matter jurisdiction despite that no party questions its existence. Federal courts have limited jurisdiction and are authorized to hear only those types of cases prescribed by Congress. *See Baggett v. First Nat. Bank of Gainesville,* 117 F.3d 1342, 1345 (11th Cir. 1997). Further, "federal courts have an independent obligation to ensure that they

**1216**

do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki,* 562 U.S. 428, 434, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011) (citing *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006)). Likewise, while an action may be removed where the district courts have original jurisdiction, 28 U.S.C. § 1441(a), the removal statutes provide that, "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

Plaintiffs originally filed this action in the Circuit Court of Madison County, Alabama, seeking to recover under state law pursuant to various contract and tort theories against Everest and another defendant, ABA Insurance Services, Inc. ("ABAIS"). (Doc. 1–1). Everest and ABAIS removed the action pursuant to 28 U.S.C. §§ 1441, 1446. (Doc. 1). As the parties invoking federal jurisdiction, Everest and ABAIS bore the burden of establishing jurisdiction. *Underwriters at Lloyd's, London v. Osting–Schwinn,* 613 F.3d 1079, 1085–86 (11th Cir.2010); *see also* FED.R.CIV.P. 8(a)(1). To that end, Everest and ABAIS asserted that this court could hear the case under the diversity statute, which confers federal jurisdiction where the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States. 28 U.S.C. § 1332(a)(1).

 The allegations of the notice of removal are sufficient to show that the amount-in-controversy requirement is not in doubt. (*See* Doc. 1, ¶¶ 12–22). However, Everest and ABAIS also had to establish the citizenship of all parties and that no defendant shares citizenship with any plaintiff. *See Stillwell v. Allstate Ins. Co.,* 663 F.3d 1329, 1332 (11th Cir.2011). For a pleading to establish *prima facie* the citizenship of a party that is a natural person, it is typically enough simply to allege the State of which that person is a citizen, *i.e.,* the State of domicile. *See Molinos Valle· Del Cibao, C. por A. v. Lama,* 633 F.3d 1330, 1342 n. 12 (11th Cir.2011); *Taylor v. Appleton,* 30 F.3d 1365, 1367 (11th Cir.1994); *see also Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 828, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). By contrast, for a party that is a corporation, partnership, or some other type of organization or association, a pleading must contain more specific factual allegations from which its citizenship may be ascertained under federal standards applicable to the particular type of entity. *See Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee Univ.,* 663 F.3d 1304, 1305 (11th Cir.2011); *Underwriters of Lloyd's, London,* 613 F.3d at 1089; *Rolling Greens MHP, LP v. Comcast SCH Holdings LLC,* 374 F.3d 1020, 1022 (11th Cir.2004); *Xaros v. U.S. Fid. & Guar. Co.,* 820 F.2d 1176, 1181–82 (11th Cir.1987); *American Motorists Ins. Co. v. American Employers' Ins. Co.,* 600 F.2d 15, 16 (5th Cir.1979).[2]

 For diversity purposes, a corporation is deemed a citizen of both the State under whose law it was incorporated and the State where it has its principal place of business. 28 U.S.C. § 1332(c)(1). As such, a pleading must allege sufficient material as to both of those prongs to make a prima facie showing of citizenship. *American Motorists,* 600 F.2d at 16; *Fidelity & Guar. Life Ins. Co. v. Thomas,* 559 Fed. Appx. 803, 805 n. 5 (11th Cir.2014). A

**2.** The *decisions of the former Fifth Circuit* handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v.*

*City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

corporation's principal place of business under § 1332(c)(1) is its "nerve center," "where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010). "In practice," this "should normally be the place where the corporation maintains its headquarters." *Id.* at 93, 130 S.Ct. 1181.

The record sufficiently demonstrates the citizenship of all parties alleged to be corporations, namely, both removing defendants, Everest and ABAIS; the later-added defendant, Security National; and Plaintiff WFH. Specifically, the notice of removal alleges that Everest was incorporated in Delaware and has its principal place of business in New Jersey and that ABAIS was both incorporated and has its principal place of business in Ohio. (Doc. 1, ¶¶ 9, 10). Security National, added as a defendant by an amendment to the complaint, has pled that it is a Delaware corporation with its principal place of business in Texas. (Doc. 24, ¶ 4). And finally, Plaintiff WFH has pled that it is an Alabama corporation that has its headquarters in Madison County, Alabama. (Doc. 1–1 at 1–2, ¶¶ 2, 5). ABAIS has been dismissed from the suit (Doc. 13), but, in any event, Plaintiff WFH, as a citizen of only Alabama, is diverse from all defendants, present and former.

■ However, the citizenship of the other plaintiff, the Bank, is another matter. In the notice of removal, it is alleged only that, "on information and belief, Plaintiffs are citizens of Alabama." Such a conclusory allegation is insufficient to establish the citizenship of a corporation or other business organization. *See Thomas v. Board of Trustees of Ohio State Univ.*, 195 U.S. 207, 214, 25 S.Ct. 24, 49 L.Ed. 160 (1904) ("The averment that the company is a citizen of the state of Indiana can have no sensible meaning attached to it."); *Fifty Associates v. Prudential Ins. Co. of Amer.*, 446 F.2d 1187, 1190 (9th Cir.1970) ("[A]n allegation that a corporation is a citizen of a certain state (without more) is not an allegation of fact, but a mere conclusion of law."); 5 C. Wright, A. Miller, et al., *Fed. Prac. & Proc.* § 1208 (3d ed.) ("[I]t is unlikely that the pleading of jurisdictional facts solely in terms of a corporation's citizenship in a particular state would, or should, be allowed."). In support of its assertion that Plaintiffs are believed to be Alabama citizens, the notice of removal cites to Plaintiffs' original state-court complaint, but that pleading states in relevant part only that "Worthington Federal Bank is a bank doing business in Huntsville, Alabama" and is "headquartered in Madison County, Alabama." (Doc. 1–1 at 1–2, ¶¶ 1, 5). Plaintiffs' subsequent amendment to their complaint in this court alleges no more. (*See* Doc. 21 at 1, ¶ 1). To the extent that the Bank might be incorporated under the law of some State, the parties' pled allegations are insufficient to establish its citizenship because they fail to (1) assert that this party is actually a corporation, rather than some other business form, or (2) identify the State of incorporation. *See American Motorists*, 600 F.2d at 16.

■ The court has reason to believe, however, that the Bank is a Federal savings association chartered pursuant 12 U.S.C. § 1464 and is now known as American Bank of Huntsville. (*Worthington* Compl. ¶¶ 9, 17 (alleging that Worthington Federal Bank is a "federally-chartered savings" bank with its headquarters in Huntsville); *Brewer* Compl. ¶¶ 25, 32 (same); https://www.facebook.com/americanbankofhuntsville ("Just wanted to remind our clients that as of August 31, 2014, Worthington Federal Bank is now known as American Bank of Huntsville.") (visited May 15, 2015); http://www.occ.gov/

topics/licensing/national-bank-lists/thrifts-by-name-pdf.pdf (listing "American Bank of Huntsville" located in Alabama as a chartered "Federal Savings Association") (visited May 15, 2015); http://www.americanbankofhuntsville.com/about-us/about-us/about-us.html ("American Bank of Huntsville became one of the few locally headquartered community financial institutions upon receiving our Federal Thrift charter in May 2007.") (last visited May 15, 2015). "In determining whether a Federal court has diversity jurisdiction over a case in which a Federal savings association is a party, the Federal savings association shall be considered to be a citizen only of the State in which such savings association has its home office." 12 U.S.C. § 1464(x); *see also Principal Bank v. First Amer. Mortg., Inc.,* 2014 WL 1092446, at *1 (M.D.Fla. Mar. 19, 2014). As that principle relates here, it appears that American Bank of Huntsville has only one location: its office in Huntsville, Madison County, Alabama. See http://www.americanbankofhuntsville.com/about-us/about-us/locations.html; (*see also Worthington* Compl. ¶ 17 (stating that Worthington Federal Bank is "a single-branch community bank" headquartered in Madison County); *Brewer* Compl. ¶ 32 (same)). Taking judicial notice of or otherwise considering the above materials, and in light of Plaintiffs' pled allegation that Worthington Federal Bank is "headquartered in Madison County, Alabama," the court concludes that there is sufficient indicia that the Plaintiff Bank is an Alabama citizen for purposes of 12 U.S.C. § 1464(x) and 28 U.S.C. § 1332 and that there is complete diversity between the parties.[3] Being satisfied that diversity jurisdiction is present[4], the court turns to the merits of Defendants' respective preliminary motions for summary judgment.

## III. SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant. Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Ala.,* 941 F.2d 1428

3. The court believes that complete diversity is quite clear in light of all of the materials cited in the text. However, to the extent that any party has qualms with or doubts about the propriety of the court taking judicial notice of some or all of the webpages cited herein or the court's analysis of the citizenship of Worthington Federal Bank, it might be advisable for such party to file an amended notice of removal, amended pleading, or other supplement that explicitly sets forth additional facts relevant to the citizenship of Worthington Federal Bank.

4. The court notes that in their amended complaint, Plaintiffs suggest that, irrespective of diversity, the court might possess jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201. (Doc. 21 at 2, ¶¶ 5, 6). However, the Declaratory Judgment Act is not an independent grant of federal jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Atlantic Marine Fla., LLC v. Evanston Ins. Co.,* 775 F.3d 1268, 1273 n. 17 (11th Cir.2014). In addition, although it appears that Worthington Federal is a federally chartered bank, a party's status as such does not itself confer federal jurisdiction. *See Morast v. Lance,* 807 F.2d 926, 929 (11th Cir.1987); *Southern Electric Steel Co. v. First Nat'l Bank of Birmingham,* 515 F.2d 1216, 1217 (5th Cir.1975).

(11th Cir.1991) (en banc); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000). At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The fact that multiple parties have filed a motion for summary judgment does not alter the Rule 56 standards applicable to each one. "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted); *see also Busby v. JRHBW Realty, Inc.*, 642 F.Supp.2d 1283, 1289 (N.D.Ala.2009). "When [multiple] parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Products, Corp. v. Sullivan Indus., Inc.*, 194 F.Supp.2d 1360, 1378 (N.D.Ga.2002) (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001)).

## IV. DISCUSSION

### A. Rules Governing Interpretation of Insurance Contracts

Sitting in diversity, this court is bound to apply Alabama substantive law, while applying federal procedural law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Palm Beach Golf Center–Boca, Inc. v. John G. Sarris,*

*DDS, PA*, 781 F.3d 1245, 1259–60 (11th Cir.2015). Under Alabama law,

"[g]eneral rules of contract law govern an insurance contract. The court must enforce the insurance policy as written if the terms are unambiguous." *Lambert v. Coregis Ins. Co., Inc.*, 950 So.2d 1156, 1161 (Ala.2006) (quoting *Safeway Ins. Co. of Ala. v. Herrera*, 912 So.2d 1140, 1143 (Ala.2005)) (internal citations and quotations omitted). Further,

the mere fact that a word or a phrase used in a provision in an insurance policy is not defined in the policy does not mean that the word or phrase is inherently ambiguous. If a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it. The court should not define words it is construing based on technical or legal terms.

*Id.* at 1161–62 (quoting *Safeway*, 912 So.2d at 1143) (internal quotations and citations omitted).

"It is well established ... that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured." *St. Paul Mercury Ins. Co. v. Chilton–Shelby Mental Health Ctr.*, 595 So.2d 1375, 1377 (Ala.1992). Further, "when ambiguity exists in the language of an exclusion, the exclusion will be construed so as to limit the exclusion to the narrowest application reasonable under the wording." *Id.* (citation omitted). "However, it is equally well settled that in the absence of statutory provisions to the contrary, insurers have the right to limit their liability by writing policies with narrow coverage." *Id.* Indeed, "[i]f there is no ambiguity, courts must en-

force insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." *Id.* (citation omitted).

Further, "[i]nsurance contracts, like other contracts, are construed to give effect to the intention of the parties and, to determine this intent, the court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Royal Ins. Co. of Am. v. Thomas,* 879 So.2d 1144, 1153–54 (Ala.2003) (quoting *Hall v. Am. Indem. Group,* 648 So.2d 556, 559 (Ala.1994)) (citation omitted). *HR Acquisition I Corp. v. Twin City Fire Ins. Co.,* 547 F.3d 1309, 1314–15 (11th Cir. 2008).

▪ Liability insurance coverage typically includes two separate duties: (1) the duty to defend, and (2) the duty to indemnify. *Tanner v. State Farm Fire & Cas. Co.,* 874 So.2d 1058, 1063 (Ala.2003).

"It is well settled 'that [an] insurer's duty to defend is more extensive than its duty to [indemnify]." *United States Fid. & Guar. Co. v. Armstrong,* 479 So.2d 1164, 1168 (Ala.1985) (citations omitted). Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint. *Id.* at 1168. If the allegations of the injured party's complaint show an accident or an occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured. *Ladner & Co. v. Southern Guar. Ins. Co.,* 347 So.2d 100, 102 (Ala.1977) (citing *Goldberg v. Lumber Mut. Cas. Ins. Co.,* 297 N.Y. 148, 77 N.E.2d 131 (1948)). However, '[t]his Court ... has rejected the argument that the insurer's obligation to defend must be determined

solely from the facts alleged in the complaint in the action against the insured.' *Ladner,* 347 So.2d at 103. In *Pacific Indemnity Co. v. Run–A–Ford Co.,* 276 Ala. 311, 161 So.2d 789 (1964), this Court explained:

" 'We are of opinion that in deciding whether a complaint alleges such injury, the court is not limited to the bare allegations of the complaint in the action against insured but may also look to facts which may be proved by admissible evidence....'

"276 Ala. at 318, 161 So.2d at 795; *see Ladner,* 347 So.2d at 103 (quoting this language). '[I]f there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured.' *Blackburn v. Fidelity & Deposit Co. of Maryland,* 667 So.2d 661, 668 (Ala.1995) (citing *United States Fid. & Guar. Co. v. Armstrong,* 479 So.2d 1164 (Ala. 1985)) (other citations omitted). When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy. *Blackburn,* 667 So.2d at 670 (citing *Tapscott v. Allstate Ins. Co.,* 526 So.2d 570, 574 (Ala.1988))."

*Tanner,* 874 So.2d at 1063–64 (quoting *Acceptance Ins. Co. v. Brown,* 832 So.2d 1, 14 (Ala.2001) (emphasis omitted)).

### B. Duty to Indemnify

▪ At the outset, Plaintiffs argue that to the extent that Everest or Security National's motions for summary judgment seek a ruling from this court that would absolve either insurer of liability to indemnify Plaintiffs for any loss they might later suffer in a judgment in the *Brewer* Law-

suit, such would be premature. The court agrees. While the existence of a duty to defend may be established by the allegations in the underlying lawsuit against the insured, the insured's liability to indemnify the insured is ultimately determined by what is developed at trial. *See Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1013 (Ala.2005); *Guaranty Nat'l Ins. Co. v. Beeline Stores, Inc.*, 945 F.Supp. 1510, 1514 (M.D.Ala. 1996). Thus, if the insured prevails in the underlying suit, the indemnity issue becomes moot, so attempting to resolve it now risks wasting judicial resources. *See State Farm Fire & Cas. Co. v. GHW*, 56 F.Supp.3d 1210, 1215 (N.D.Ala.2014). It may also still be possible for the plaintiff in the underlying suit to add a claim or change the theory of liability so as to assert a claim covered by one or more of the policies at issue. *See Beeline Stores*, 945 F.Supp. at 1514. Therefore, it is too early to address duty-to-indemnify issues while the underlying action remains pending in state court. *See Hartford Cas. Ins. Co.*, 928 So.2d at 1013; *State Farm Fire & Cas. Co. v. GHW*, 56 F.Supp.3d 1210, 1215 (N.D.Ala.2014); *Employers Mut. Cas. Co. v. Smith Constr. & Develop., LLC*, 949 F.Supp.2d 1159, 1176 (N.D.Ala.2013); *see also American Safety Indem. Co. v. T.H. Taylor, Inc.*, 513 Fed.Appx. 807, 810 n. 4 (11th Cir.2013). To the extent that the respective motions for summary judgment seek a determination that no duty to indemnify exists, the motions are due to be denied.

## C. Duty to Advance Defense Costs

The court notes that neither the Everest Policy nor the Security National Policy technically obligates the insurer to "assume" or "provide" a "defense" for the insured, even as to covered claims. (*See* Doc. 38–1 at 15, § VII(A)(1); Doc. 38–2 at 5, 16, § VIII(A)). Rather, the Everest Policy only requires the insurer to indemnify for a covered "Loss," which not only "any amount which the Insured is legally obligated to pay resulting from a Claim, including damages, judgments, [and] settlements," but also "Defense Costs," defined as "reasonable and necessary legal fees and expenses incurred in defending or investigating" a covered claim. (Doc. 38–1 at 7–8 (emphasis omitted)[5]). However, while the insured is responsible for securing its own legal defense, the Everest Policy does generally require the insurer to "advance covered Defense Costs on a current basis." (*Id.* at 15, § VIII(B)(1)). The Security National Policy is to the same effect, requiring indemnity for a covered "Loss," which includes "Defense Expenses," terms defined similarly to their counterparts in the Everest Policy, and requiring the insurer to make "advance payment for defense expenses" "on a current basis." (Doc. 38–2 at 5–9, 16).

The assumption of the defense itself and the advancement of costs of the defense "are discrete concepts." *American Legacy Found., RP v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 F.3d 135, 141 (3d Cir.2010). Specifically, "[w]hen an insurance company assumes a defense, it retains and remunerates counsel; ordinarily no reimbursement of legal fees is required, even if the underlying claim proves false, fraudulent, or unfounded. In contrast, if an insurer agrees to advance the costs of a defense, ... the insured must request in writing the insurer's consent before incurring defense costs and may be required to repay the insurer for advanced payments." *Id.*; (*see also*

---

5. Throughout the Everest Policy, certain terms appear in bold type to identify the term as one appearing in the definition section of that policy. Whenever the Everest Policy is quoted herein, the bold emphasis for defined terms is omitted.

*generally* Doc. 38–1 at 15; Doc. 382 at 16). The Alabama appellate courts do not appear to have addressed how an insurer's duty to advance defense costs is to be analyzed relative to the more standard duties of assuming the defense and indemnifying a loss. Nonetheless, the court concludes that, at least as it relates here, an "insurer's obligation to advance defense expenses is not materially different from a duty to defend." *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.,* 295 F.R.D. 550, 601 (S.D.Fla.2013) (quoting *Julio & Sons Co. v. Travelers Cas. & Sur. Co.,* 591 F.Supp.2d 651, 664 (S.D.N.Y.2008)). Courts considering whether an insurer's obligation to advance defense costs is triggered generally do so using standards that are the same or similar to those employed to ascertain whether an insurer has a duty to provide the defense itself, *i.e.,* by looking principally at whether the allegations of the complaint in the underlying lawsuit assert a potentially covered claim in light of the policy language, construing the duty broadly in favor of the insured. *See Liberty Mut. Ins. Co. v. Pella Corp.,* 650 F.3d 1161, 1170 (8th Cir.2011); *W Holding Co., Inc. v. AIG Ins. Co.-Puerto Rico,* 748 F.3d 377, 384 (1st Cir.2014); *Julio & Sons,* 591 F.Supp.2d at 659–60; *Federal Ins. Co. v. Kozlowski,* 18 A.D.3d 33, 40–41, 792 N.Y.S.2d 397, 402–03 (N.Y.A.D. 1 Dept. 2005); *American Chem. Soc. v. Leadscope, Inc.,* 2005 WL 1220746, at *4–8 (Ohio App. 10 Dist.2005). The court will likewise do so here.

### 1. Everest's Motion

Because the Everest Policy was issued first and has the earlier coverage period, the court will address Defendant Everest's motion for partial summary judgment first. Everest's primary argument is straightforward: Everest contends that it is entitled to summary judgment as to claims based on its obligations to Plaintiffs vis-á-vis the *Brewer* Lawsuit because it was not filed until after the coverage period of the Everest Policy had lapsed. In support, Everest observes that its policy is a "claims-made policy," under which Everest will pay for "Loss resulting from Claims first made during the Policy Period or the Discovery Period against the Insured Persons...." (Doc. 38–1 at 5; *see also id.* at 1). In discussing the nature of "claims made" policies generally, the Alabama Supreme Court has stated:

> [Under a] "claims made" policy ... a carrier agrees to assume liability for any errors, including those made before the inception of the policy, as long as the claim is made during the policy period. On the other hand, an "occurrence" policy provides coverage for any acts or omissions that arise during the policy period, even though the claim is made after the policy has expired. *Homestead Ins. Co. v. American Empire Surplus Lines Ins. Co.,* 44 Cal.App.4th 1297, 52 Cal.Rptr.2d 268 (1996).

In order to reduce exposure to an unpredictable and perhaps lengthy "tail" of lawsuits brought long after an "occurrence" policy period has ended, insurance carriers developed "claims made" policies. Such policies limit an insurer's risk by restricting coverage to the policy in effect when a claim is asserted against the insured, without regard to the timing of the damage or injury. This restriction allows the carrier to establish reserves despite inflation, upward-spiraling jury awards, or enlarged tort liability occurring after the policy period. "Claims made" policies permit insurers to predict more accurately both the limits of their exposure and the premium needed to accommodate the risk undertaken. *Homestead, supra.*

The hallmark of a "claims made" policy is that exposure for claims terminates with the expiration or termination of the policy, thereby providing certainty in

gauging potential liability; this certainty in turn leads to more accurate calculation of reserves and premiums. "Claims made" policies benefit insureds by making coverage cheaper and more widely available. *Homestead, supra.*

Thus, a "claims made" policy limits coverage to claims made against the insured during the policy period. Coverage does not depend on when the "actual or alleged negligent act, error or omission" occurs. Instead, coverage depends on when the claim is made against the insured. Under a "claims made" policy, the insurer generally is responsible for loss resulting from claims made during the policy period, no matter when the liability-generating event took place. An "occurrence" policy may be triggered in one of several ways. The event that triggers a "claims made" policy, by contrast, is transmission of notice of the claim. *Homestead, supra.*

*Attorneys Ins. Mut. of Ala., Inc. v. Smith, Blocker & Lowther, PC,* 703 So.2d 866, 869 (Ala.1996); *see also Langley v. Mutual Fire, Marine & Inland Ins. Co.,* 512 So.2d 752 (Ala.1987) (holding that claims-made policies are not void as against public policy), *overruled on other grounds, Hickox v. Stover,* 551 So.2d 259 (Ala.1989).

Everest emphasizes that the *Brewer* Lawsuit was not filed until April 2014, about four months after the coverage period of the Everest Policy expired in December 2013. Everest argues, therefore, that it is not bound under its "claims-made" policy to advance defense costs in the *Brewer* Lawsuit. Everest further maintains that Plaintiffs had the option under the Everest Policy to purchase an extended reporting period or "tail," which would have provided coverage for claims made after the Policy ends which are based on "wrongful acts" that occurred during the Policy Period but resulted in a claim made during an extended "discovery period." In this vein, the Everest Policy provides:

## SECTION III—DISCOVERY PERIOD

A. . . . . . [T]he Insured shall have the right to purchase an optional extended reporting period (herein called the Discovery Period) [of 180 days] . . . . .

B. The Discovery Period is not an extension of coverage, but rather an extended reporting period for Claims first made during the Discovery Period resulting from Wrongful Acts that occurred prior to the effective date of cancellation, nonrenewal or conversion and otherwise covered under this Policy. Notice of facts and circumstances that may give rise to a Claim, pursuant to Section X(B), must be given during the Policy Period and shall not be effective if given during the Discovery Period.

(Doc. 38–1 at 6; *id.* at 1, "Item 4"). Everest emphasizes that Plaintiffs did not exercise their option to purchase this "discovery period" "tail," but Plaintiffs are now attempting, Everest says, to obtain coverage for the *Brewer* Lawsuit as if they had done so.

Plaintiffs acknowledge that the complaint in the *Brewer* Lawsuit does not, on its face, allege a covered claim under the Everest Policy because the *Brewer* Lawsuit was not filed during the coverage period of the Everest Policy. Nonetheless, Plaintiffs argue that the *Brewer* Lawsuit is covered under the Everest Policy because that complaint contains allegations of the same or sufficiently similar or related wrongful acts to those underlying the *Worthington* Lawsuit such that the two lawsuits are part of the same single "claim." In support of their position, Plaintiffs point to the following provision of the Everest Policy:

## SECTION VI—LIMIT OF LIABILITY, RETENTION AND INDEMNIFICATION

\* \* \*

C. **SINGLE CLAIM**—Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts committed by one or more Insureds shall be considered a single Claim, and only one Retention and Limit of Liability shall apply to such single Claim. Each such single Claim shall be deemed to be first made on the date the earliest of such Claims was first made, regardless of whether such date is before or during the Policy Period.

(Doc. 38–1 at 14). Based on this provision, Plaintiffs assert that because they received and reported the *Worthington* Lawsuit as a "claim" within the Everest Policy period, the *Brewer* Lawsuit is covered as part of the same "claim" because the *Brewer* Lawsuit is, they say, based at least in part on alleged wrongdoing that is related to that alleged in the *Worthington* Lawsuit.

Thus, for the *Brewer* Lawsuit to be covered under the Everest Policy, two things have to be true. First, the "single claim" provision of the Everest Policy must operate to provide coverage for a "claim" of which notice was given to Everest outside of the policy period on the ground that such claim is the same or sufficiently related to another "claim" made during the policy period. And second, that broader legal principle must apply to the particular facts of this case; that is, the wrongdoing alleged in the *Brewer* Lawsuit must, for purposes of the Everest Policy, be sufficiently related to the wrongdoing alleged in the *Worthington* Lawsuit to allow such "relation back" coverage under the "single claim" provision. Everest and Plaintiffs clash over both of those issues. The court addresses each in turn.

As to the first question, the Alabama Supreme Court held in *Blackburn v. Fidelity & Dep. Co. of Maryland*, 667 So.2d 661 (Ala.1995), that a "single claim" provision of a "claims made" policy operated to extend coverage for claims made outside of the policy period based upon its relationship to covered claims made within the policy period. There, the plaintiff insured was a corporate director who had sought a defense and indemnity from the insurer as it related to claims for breach of fiduciary duty. *See* 667 So.2d at 664–666. The insurer had denied coverage on the basis that the policy period was from May 1988 to May 1989 while the subject claims for breach of fiduciary duty had not been asserted against the plaintiff insured until October 1990 in one action and July 1991 in another, through a complaint and an amended complaint, respectively, filed in separate lawsuits. *Id.* at 670. The plaintiff argued, however, that those claims were covered based upon the causes of action alleged in earlier-filed lawsuits against the plaintiff and other directors who were his co-insureds, in light of a "single claim" provision of the policy that stated as follows:

Claims based on or arising out of the same act, interrelated acts or one or more series of similar acts of one or more of the Insured shall be considered a single claim which, for purposes of this policy, shall be deemed to have been made at the time the first of such claims is made against any Insured.

*Id.* The Alabama Supreme Court agreed with the plaintiff, holding that while the breach-of-fiduciary-duty claims against him were made outside of the policy period, they were deemed to have been made during the policy period under the "single claim" provision because they constituted part of the same claim or claims that had been raised in lawsuits filed in December 1988 and January 1989. *Id.*

■ The court concludes that *Blackburn* is controlling and allows that the "single claim" provision of the Everest Pol-

icy might potentially render claims in the *Brewer* Lawsuit to have been made as part of the same claims raised in the *Worthington* Lawsuit, provided that the claims in the two cases are sufficiently related. Everest raises a number of challenges to that determination, but none is convincing. First, Everest attempts to distinguish *Blackburn* based on differences between the language of the respective "single claim" policy provisions. Everest points out that the "single claim" provision in *Blackburn* expressly stated that it applies "for purposes of this policy," such that it was appropriate to construe it as having "policy-wide implications," including expansion of coverage for claims made outside of the limitations period. (Doc. 42 at 5). By contrast, Everest observes, the "single claim" provision of the Everest Policy contains no such language and appears in the section of the policy under the heading, "Limit of Liability, Retention and Indemnification." Thus, Everest argues, the provision should be construed narrowly as "limited to calculating liability limits and retention for claims actually made during the Policy Period, not for all purposes under the Policy." (*Id.* at 6).

Everest's argument has a host of flaws. Nothing in *Blackburn* suggests that the Alabama Supreme Court's analysis depended upon whether the "single claim" provision expressly stated that it applied "for purposes of this policy." Also, Everest's contention that the "single claim" provision is intended only to set the limits of liability for a single claim and retention amounts is based in large part upon the fact that the provision is located within the Everest Policy under the in the section header, "Limit of Liability, Retention, and Indemnification." The significance of that, however, is undercut by the policy's stipulation that "the descriptions in the headings and subheadings in this Policy are solely for convenience and form no part of the terms and conditions of coverage."

(Doc. 381 at 21, § XIV (J)); *see Nomura Holding Amer., Inc. v. Federal Ins. Co.*, 45 F.Supp.3d 354, 368–69 (S.D.N.Y.2014). Moreover, there is no mention in *Blackburn* of the section or heading of the policy under which that "single claim" provision was located, thereby suggesting that the Court did not consider such to be material.

But more fundamentally, Everest is inviting this court to read the "single claim" provision of its policy narrowly in order to defeat coverage when it does not unambiguously provide that its application is limited only to calculating the limits of liability and retention amounts. That approach is inconsistent with Alabama law, pursuant to which ambiguities in policy language are construed in favor of the insured, and any exceptions from coverage are construed narrowly so as to provide maximum coverage. *Blackburn*, 667 So.2d at 669; *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 898 (11th Cir.2009). Indeed, the court concludes that, contrary to Everest's assertion, the "single claim" provision in the Everest Policy unambiguously does bear upon the scope of coverage, *i.e.*, what substantive claims are covered, not just upon calculating the limits of Everest's liability or retention amounts. Specifically, the Everest Policy's general insuring clause provides that Everest will pay a loss resulting from "Claims first made during the Policy Period." That dovetails with the policy's "single claim" provision, which states that "Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts … shall be considered a single Claim, and … [e]ach such single Claim shall be deemed to be first made on the date of the earliest of such Claims was first made, regardless of whether such date is *before or during* the Policy Period." (Doc. 38–1 at 14 (emphasis added)). Courts have construed such "timing-of-claim" language to allow an in-

surer to deny coverage for a claim made during the policy period where the claim is sufficiently related to a covered claim that was "first made ... before ... the Policy Period." (*Id.*) *See Nomura Holding*, 45 F.Supp.3d at 368–70; *Gladstone v. Westport Ins. Corp.*, 2011 WL 5825985, at *7–9 (D.N.J. Nov. 16, 2011); *G–I Holdings v. Hartford Fire Ins. Co.*, 2007 WL 842009, at *8–9, *aff'd*, 586 F.3d 247, 257–58 (3d Cir.2009); *Federal Ins. Co. v. Surujon*, 2008 WL 2949438, at *5 (S.D.Fla. July 29, 2008); *Biltmore Associates, LLC v. Twin City Fire Ins. Co.*, 2006 WL 2091667, at *3–4 (D.Ariz. July 21, 2006); *Seneca Ins. Co. v. Kemper Ins. Co.*, 2004 WL 1145830, at *3–4 (S.D.N.Y. May 21, 2004), *aff'd*, 133 Fed.Appx. 770 (2d Cir.2005); *see also Sharp Realty & Management, LLC v. Capitol Specialty Ins. Corp.*, 503 Fed. Appx. 704, 709–10 (11th Cir.2013) (holding that, under Alabama law, generally similar policy language authorized denial of coverage for claims made during policy period because they were deemed to be part of the same claim made prior to the commencement of the policy period). Indeed, it is unclear what purpose language calling for relation back of one claim to another one "first made" "before the Policy Period" might have other than to exclude from coverage a claim that was itself made "during the Policy Period." *See Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *14 (E.D.N.Y. Oct. 30, 2014); *Biochemics, Inc. v. Axis Reinsurance Co.*, 963 F.Supp.2d 64, 70–71 (D.Mass.2013). But that being so, such a provision will by the same token obligate the insurer to cover a claim made after the expiration of the policy period if it is sufficiently related to a covered claim "first made" during the policy period, just as occurred in *Blackburn. See Glascoff v. OneBeacon Midwest Ins. Co.*, 2014 WL 1876984, at *1 (S.D.N.Y. May 8, 2014) (materially similar language allowed that "even if a Claim is brought after the termination of the Policy's Ex-

tended Reporting Period, if that Claim is an Interrelated Wrongful Act with another Claim filed during the Policy Period, [the insurer] is obligated to provide insurance coverage for both Claims."); *Harvard Drug Group, LLC v. Twin City Fire Ins. Co.*, 2011 WL 3426193, at *3 (E.D.Mich. Aug. 5, 2011); *Benefit Syst. & Services, Inc. v. Travelers Cas. and Sur. Co. of Amer.*, 2009 WL 1106948, at *6 (N.D.Ill. Apr. 22, 2009) (recognizing that a counterclaim filed against the insured after the policy period would "not [be] covered unless it was related to a claim that was made during the policy period"); *see also* John E. Zulkey, *Related and Interrelated Acts Provisions: Determining Whether Your Claims are Apples and Oranges, or Peas in a Pod*, 50 Tort Trial & Ins. Prac. L.J. 83, 91–94 (2014). What's good for the goose is good for the gander.

Everest also emphasizes that the opinion in *Blackburn* identified the "single claim" provision there as a "'relation-back' clause," 667 So.2d at 670, while the "provision in the Everest Policy has no such title nor is it found under such a section heading with that language." (Doc. 42 at 6). This argument is without merit. There is nothing in *Blackburn* suggesting that the Court's use of the term "relation-back" was related to or derived from where the provision appeared in the policy, and, again, the fact that the opinion did not mention the applicable section or heading indicates that the Court did not perceive that to be important. Instead, the "relation-back" moniker appears to have been simply the *Blackburn* Court's own shorthand description of the clause's operative effect, based upon its plain language deeming all related claims to be a single claim made at the time when the first such claim was made. While the language of the "single claim" provision in the Everest Policy is not identical, it is materially similar in its "single claim" and "first filed" provi-

sions and is thus equally susceptible to being characterized as a "relation-back" clause.

Everest nonetheless insists that *Blackburn* might be disregarded on the ground that the opinion does not clearly "set forth the policy interpretation arguments made by the parties on each of the points," so "the decision," Everest posits, "provides no real guidance as to how the parties addressed the specific 'relation back' provision, or where the quoted provision appeared and whether it was associated with language clearly providing that a claim made outside of the policy period would be considered timely for purposes of the claims-made coverage." (Doc. 38 at 18, 19). This argument is a nonstarter. As Everest acknowledges, *Blackburn* "clearly involved competing arguments as to coverage for claims made after the expiration of the policy." (Doc. 38 at 18). And the fact is that *Blackburn* unambiguously and necessarily resolved those arguments against the insurer, holding that, although the policy period ran from May 1988 to May 1989, claims made thereafter in both an original complaint (filed October 1990) and an amended complaint (filed in July 1991), were sufficiently related to claims raised in other pleadings filed within policy period such that the later claims were also deemed, based upon a "single claim" provision, to have been "first filed" within the policy period. 667 So.2d at 670. Under *Erie* principles, holdings of the Alabama Supreme Court on state law are binding on this court. *See State Farm Mut. Auto. Ins. Co. v. Duckworth,* 648 F.3d 1216, 1224 (11th Cir.2011). Everest cannot circumvent the holding in *Blackburn* merely by quibbling with the level of detail in the Alabama Supreme Court's explanation of how it reached the result it did.

Next, Everest argues that *Blackburn* does not govern because this court is bound to follow instead the Alabama Supreme Court's decision in *Attorneys Insurance Mutual of Alabama v. Smith, Blocker & Lowther, PC,* 703 So.2d 866 (Ala. 1996). In that case, the insured was a law firm that had been retained by a client to form a Subchapter S corporation and to file associated documentation with the Internal Revenue Service ("IRS"). 703 So.2d at 868. A firm partner set up the S corporation but failed to timely file the documentation with the IRS in March 1993. *Id.* In October 1993, the client made a demand upon the partner for $12,060, representing additional income tax that the client alleged it had been required to pay because of the partner's failure to file the Subchapter S forms with the IRS. *Id.* The firm was insured under a professional liability policy, but the firm decided simply to pay the client's demand itself and did not report the claim to the insurer at the time. *Id.* In September 1994, however, the client made a second demand on the partner, also based upon his failure to timely file the Subchapter S forms with the IRS, prompted by the client's discovery that such omission had also allegedly caused the client to owe an additional $270,000 in capital gains tax stemming from a real estate sale. *Id.* The day after receiving that demand, the firm notified its insurer of the claim and sought coverage. 703 So.2d at 868. After investigating, the insurer denied coverage, *id.,* relying on a "single claim" provision in the "limits of liability" section of the policy that stated as follows:

> The inclusion herein of more than one insured or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase the Company's limit of liability. Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim. All such

claims, whenever made, shall be considered first made during the policy period or extended reporting endorsement period in which the earliest claim arising out of such act, error, omission or personal injury was first made, and all such claims shall be subject to the same limit of liability.

*Id.* at 869 (emphasis added in *Attorneys Ins.* is omitted here). In particular, the insurer argued that, under this provision, the claim made in September 1994 was part of the same claim "first made" in October 1993 because both arose out of the same omission: the partner's failure to timely file the Subchapter S forms with the IRS. *Id.* As such, the insurer argued, the insured's failure to give notice of that omission or any demand until September 1994 did not comply with the policy's requirement that the insured give prompt notice of the claim. *Id.* at 868–69.

After the insured filed suit, however, both the trial court and the Alabama Supreme Court rejected the insurer's position. *Id.* at 868–70. The Alabama Supreme Court began by recognizing that the policy was a "claims made" policy rather than an "occurrence" policy, meaning that it afforded coverage for a claim made, that is, a money demand received by the insured, during the policy period, rather than based upon the timing of the insured's allegedly wrongful act or omission. *See* 703 So.2d at 869–70. While the insurer urged that the "single claim" provision rendered the two separate money demands but a single claim for all purposes, including when notice thereof had to be given to the insurer, the Court disagreed. *Id.* It concluded, rather, that, reading the entire policy in context, the insurer was bound to cover the second claim because the insurer had received timely notice of it and other policy terms had permitted the insured to settle the first claim "at personal cost." *Id.* at 870. The Court further reasoned that, even if the two demands arose from a single omission, it could not be said that the insured was attempting to cast the two demands as separate claims simply to double the policy limits, in contravention of the "single claim" provision, so the insured was entitled to coverage for the second claim. *Id.*

Everest argues that *Attorneys Insurance* "requires" a finding that the "single claim" provision of its policy cannot extend coverage for any claim made after the expiration of the policy period, even if such claim arises from the same or interrelated acts or omissions underlying a covered claim made within the policy period. (Doc. 42 at 3–4). *Attorneys Insurance*, however, is inapposite. That case did not ask whether a claim made outside the policy period might relate back to a covered claim first filed within the policy period of a "claims made" policy. In fact, the court's opinion never even identifies the policy period. But this case and *Attorneys Insurance* are different on an even more fundamental level. Here, the party seeking "single claim" treatment for a later claim (the *Brewer* Lawsuit) is relying upon its relationship to an earlier, "anchor" claim (the *Worthington* Lawsuit) for which the insured sought coverage and gave timely notice to the insurer. By contrast, the party seeking "single claim" treatment for the later claim in *Attorneys Insurance* was relying on its relation to a would-be "anchor" claim that the insured had voluntarily paid itself, as the Court held the policy to have allowed, and the insured did not seek coverage for it at any time. In other words, *Attorneys Insurance* is about whether a "single claim" provision might allow an insurer to deny coverage for a later claim under a "claims made" policy based on the fact that it did not receive timely notice of a prior demand that was, practically speaking, a mere "phantom" claim that the insured had permissibly paid out of its own pocket. That is simply

not the situation here, so *Attorneys Insurance* is not controlling.

■ Finally, Everest relies heavily on *Homestead Ins. Co. v. American Empire Surplus Lines Ins. Co.*, 44 Cal.App.4th 1297, 52 Cal.Rptr.2d 268 (1996), a case that is liberally cited in *Attorneys Insurance, see* 703 So.2d at 869. (Doc. 38 at 8–11; Doc. 42 at 4–5; *see also ante* at 15–16). In *Homestead,* a California appellate court rejected an argument like that made by Plaintiffs here, holding that a "single claim" provision did not afford coverage under a "claims made" policy for a claim made after the expiration of the policy period even assuming that the claim was intimately related to a covered claim made within the policy period. 44 Cal.App.4th at 1303–06, 52 Cal.Rptr.2d 268. Such was based on the court's view that "claims made" policies, by their nature, simply do not ever cover claims made after the policy period. *Id.* However, the citations to *Homestead* in *Attorneys Insurance* were isolated to a background discussion of the basic differences between "claims made" policies and "occurrence" policies generally speaking and did not at all broach the facts, result, or any holding in *Homestead. See* 703 So.2d at 869. Thus, it cannot be assumed that *Attorneys Insurance* approved of *Homestead*'s substantive analysis or holding as it applied to the particular policy, including the language of its "single claim" provision, or the underlying claims made against the insured. That is especially true given that just the term before *Attorneys Insurance* was decided the Alabama Supreme Court had held in *Blackburn* that a "single claim" provision in a "claims made" policy did allow coverage for claims made outside the policy period based upon their relation to similar claims made within the policy period to which coverage applied, as discussed previously. That holding in *Blackburn* is irreconcilable with *Homestead* insofar as the latter seems to rigidly interpret "claims made"

policies as *never* covering claims made after the policy period. *See also Friedman Professional Mgmt. Co. v. Norcal Mut. Ins. Co.,* 120 Cal.App.4th 17, 33, 15 Cal. Rptr.3d 359, 371 (2004) ("To the degree that *Homestead* can be read for the blanket proposition that no claim made after the expiration of a claims made policy can ever be ascribed to that policy because the definition of claim is "subordinate" to the insuring clause promising to pay any claim made during the policy period we must respectfully part company with it."). Everest observes that *Blackburn* was decided before *Attorneys Insurance* (Doc. 42 at 5), but to the extent such is meant to suggest that the former was abrogated by the latter, that proposition is rejected out of hand. Again, *Attorneys Insurance* does not even address the same specific issue as *Blackburn,* and despite their temporal proximity and the fact that four of the five Justices were the same in both cases, *Attorneys Insurance* does not even mention *Blackburn.* And while it is possible for one case to overrule another *sub silentio,* "[a]rguments based on what courts do not say, logically speaking, are generally unreliable and should not be favored by the judiciary." *Ex parte James,* 836 So.2d 813, 818 (Ala.2002).

■ Based on the foregoing, the court concludes that, under the reasoning of *Blackburn,* Everest is not entitled to summary judgment based on its theory that the "single claim" provision of the Everest Policy cannot authorize coverage for claims made after the policy period even if they are sufficiently related to covered claims first made within the policy period. Thus, the question becomes whether the later claims in the *Brewer* Lawsuit are sufficiently related to the earlier claims in the *Worthington* Lawsuit for purposes of the Everest Policy such that they all might

be considered part of the same single claim. The court now turns to that issue.

Again, the "single claim" provision of the Everest Policy states in relevant part that "Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts committed by one or more of the Insureds shall be considered a single claim." (Doc. 38–1 at 14). In turn, the Everest Policy defines the terms "Wrongful Act" and "Interrelated Wrongful Acts" in relevant part as follows:

> *Wrongful Act,* either in singular or plural, means any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by:
>
> (1) any Insured Person in the discharge of their duties while acting solely in the capacity as such[.]

(Doc. 38–1 at 10).

> *Interrelated Wrongful Acts* means Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

(*Id.* at 8).

 In determining whether two or more claims are sufficiently related. to be deemed part of same claim for purposes of an insurance policy, the focus is on the relationship between the facts that give rise to the claim rather than on any procedural grouping that occurs during litigation. *See Colbert County Hosp. Bd. v. Bellefonte Ins. Co.,* 725 F.2d 651, 653–54 (11th Cir.1984) (holding, under Alabama law, that although a patient filed only one lawsuit against the insured hospital, her suit, which sought recovery for three separate injuries allegedly resulting from three separate hospital admissions, raised three "claims" within the meaning of the hospital's professional liability policy). The Alabama Supreme Court has recognized that, even if an insured allegedly committed multiple acts of malfeasance in connection with a given matter or transaction, where those acts or errors lead to a single resulting injury, claims seeking to recover for that injury are logically "related" such that they form part of the same claim, even if one act of negligence is not causally connected to another. *Continental Cas. Co. v. Brooks,* 698 So.2d 763, 764–65 (Ala.1997) (per curiam) (citing *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993)); *see also Gregory v. Home Ins. Co.,* 876 F.2d 602, 606 (7th Cir.1989) (cited with approval in *Bay Cities* ); *Continental Cas. Co. v. Wendt,* 205 F.3d 1258, 1262–64 (11th Cir.2000) (applying Florida law). On the other hand, where there is a single discrete cause that is alleged to have resulted in injuries to numerous plaintiffs, the claims brought by such plaintiffs are also considered to have been based on one "occurrence" for policy purposes.[6] *See Home Indemn. Co. v. City of Mobile,* 749 F.2d 659, 663 (11th Cir.1984); *see also Home Indemn. Co. v. Anders,* 459 So.2d 836, 843 (Ala.1984); *Certain Underwriters at Lloyd's, London v. Southern Nat. Gas Co.,* 142 So.3d 436, 453–57 (Ala. 2013). While claims may be sufficiently "related" in this context based upon either logical or causal connections, "[a]t some point, a relationship between two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected that they would be treated as a single

---

6. While the difference between a "claim" and an "occurrence" can be crucial because it may determine whether and when the insurer's obligation is triggered, in analyzing "related acts" provisions, courts typically employ the same analysis regardless whether the issue is the number of "claims" or "occurrences." *See* Zulkey, *supra,* 50 Tort Trial & Ins. Prac. L.J. at 87–88.

claim under the policy." *Bay Cities*, 5 Cal.4th at 873, 21 Cal.Rptr.2d at 703, 855 P.2d at 1275. Ultimately, determining whether claims are "related" is a highly fact-dependent inquiry, with courts looking to the following factors, none of which is by itself necessarily outcome-determinative: (1) whether the claims are made by the same or different parties, (2) whether the claims arise from the same or different acts or omissions, (3) whether the acts are part of a pattern of similar activity, (4) whether there is a significant lapse of time between the causes giving rise to the claims, and (5) whether the claims arise from the same or a different injury. *See* Zulkey, 50 Tort Trial & Ins. Prac. L.J. at 99–104 & nn. 46–55 and the cases cited therein. With these principles and the relevant Everest Policy terms in mind, the court turns to examine the claims raised in the *Worthington* and *Brewster* Lawsuits.

The *Worthington* Lawsuit, filed on February 6, 2013, was originally brought by Judy Worthington ("Mrs. Worthington"), who raised direct claims on her own behalf and derivative claims on behalf of both WFH and its wholly-owned subsidiary, the Bank. (*See Worthington* Compl.). In that pleading, it is alleged as follows: Mrs. Worthington and her husband, William L. Worthington ("Mr. Worthington") (collectively the "Worthingtons"), are substantial, but minority, shareholders in WFH and the namesakes of both it and the Bank (hereinafter the "Companies"). When the Companies were first organized in 2007,

Mr. Worthington was the Chief Executive Officer ("CEO") and the Chairman of the Board of Directors of each, and Mrs. Worthington's business, Total Media Management, LLC ("Total Media"), was hired to do the Bank's marketing and advertising, and it developed a sales system used by the Bank to field mortgage loan inquiry calls. (¶¶ 16, 18–22). However, the Worthingtons' influence over the Companies' Boards and the Bank's senior management began to wane by July 2009 when a new President of the Bank was named, Tim Singleton, Jr., and he was given a position on the Board of Directors of both Companies. (¶ 23). In 2010, Singleton was appointed CEO of the Bank, and Mr. Worthington's title was changed to Principal Executive Officer of the Bank, although he remained CEO of WFH. (¶ 23). Singleton, in turn, brought in Sandra Stephens as the Bank's Chief Financial Officer. (*Id.*) In the *Worthington* Lawsuit, Mrs. Worthington [7] brought a host of claims against Stephens, Singleton, and four members of Boards of Directors the Companies: Jan Smith, David Karabinos, Mike Friday, and Shaul Zislin (collectively the "*Worthington* Lawsuit Defendants"). (¶¶ 2–7). These claims were brought under Alabama state law theories of breach of fiduciary duty, negligence or "gross negligence," "shareholder oppression," "depreciation of corporate stock," fraudulent misrepresentation, fraudulent suppression, and conspiracy, and were founded upon one or more of the

---

7. It is alleged in the briefs that an amended complaint was filed in the *Worthington* Lawsuit on March 22, 2013, by which Mr. Worthington and one Neal Webster were named as additional plaintiffs. (Doc. 36 at 3). Defendants here have also both indicated that their respective summary judgment evidentiary submissions include a copy of both an original complaint and amended complaint from the *Worthington* Lawsuit. (*See id.;* Doc. 38 at 3, ¶ 4). However, the cited exhibits contain only an original complaint (Doc. 36–2, Doc. 38–3), although one does also include a verification page signed by Mr. Worthington on April 4, 2013, which suggests that he was then a party to the suit. (Doc. 38–3 at 24). Ultimately, however, it is immaterial to the court's resolution of the instant motions for summary judgment whether the *Worthington* Lawsuit is deemed to have been brought by Mrs. Worthington alone or in conjunction with her husband and Webster.

following alleged acts of the *Worthington* Lawsuit Defendants:

(1) they assumed an "adversarial position" against Federal bank regulators who had investigated the Bank in 2011 and 2012 and had required it to abide by certain conditions relative to credit administration and capital management (*Worthington* Compl. ¶¶ 24–26, 28, 33–35, 39, 44–48);

(2) they refused to negotiate with good-faith potential purchasers of the Bank's assets substantively and in a timely manner on a deal which would greatly benefit the shareholders (*id.* ¶¶ 36, 39, 44–48);

(3) they prevented Mr. Worthington, as CEO and Chairman of the Board of WFH and Chairman of the Board and Principal Financial Officer of the Bank, from contacting regulators, shareholders, or employees (*id.* ¶¶ 28–31, 39, 44);

(4) they prevented Mr. Worthington from performing duties owed to the Bank and WFH and the shareholders, eventually causing him to resign, thus depriving the companies of his service (*id.* ¶¶ 26, 28–32, 39, 44, 46–48);

(5) they terminated the relationship with Mrs. Worthington's company, Total Media, depriving the companies of its services (*Worthington* Compl. ¶¶ 16, 20–22, 27, 39, 44–53);

(6) they made false statements to WFH's shareholders concerning their dispute with the Worthingtons, including in an email sent by Stephens on January 19, 2013 (*id.* ¶¶ 38–39, 44–48, 56–59);

(7) they made false statements to WFH shareholders, including at a shareholders meeting on January 28, 2013, concerning the *Worthington* Lawsuit Defendants' failure to interact res-

ponsibly with the federal regulators (*id.* ¶¶ 35, 39, 44–48, 56–59); and

(8) they made false statements in which they knowingly depreciated the value of WFH's shares which negatively impact their actual value (*id.* ¶¶ 37, 39, 44–48, 54–55)

The *Brewer* Lawsuit was filed in April 2014 by a group of 13 plaintiff shareholders of WFH that did not include Mr. or Mrs. Worthington. (*See Brewer* Compl. ¶¶ 1–13). Those plaintiffs, represented by the same attorneys acting as counsel for Mrs. Worthington in her lawsuit, asserted claims derivatively on behalf of the Bank and WFH, accusing the same defendants as those in the *Worthington* Lawsuit, *i.e.*, Singleton, Stephens, Smith, Karabinos, Friday, and Zislin; plus two others, Joe Carden and Steven R. Denny, who were also alleged to have been members of the Board of Directors of both of the Companies. (*Id.* ¶¶ 15–23). The plaintiffs in the *Brewer* Lawsuit asserted Alabama state law claims under theories of breach of fiduciary duty, negligence or "gross negligence," fraudulent misrepresentation, fraudulent suppression, and conspiracy, which were based on the following alleged acts and omissions attributable to the defendants in the *Brewer* Lawsuit, as follows:

(1) they refused to negotiate with good-faith potential purchasers of the Bank's assets substantively, for fair value, and in a timely manner on a deal which would greatly benefit the shareholders (*Brewer* Compl. ¶¶ 42, 51);

(2) they misled the Bank's investors, including at shareholder meetings on January 28, 2013 and June 10, 2013, that they had a plan to make the Bank more profitable and that the Bank's condition was improving under their leadership (*id.* ¶¶ 38–39, 51);

(3) they caused Worthington to leave the Bank due to a personality dispute, depriving the Bank of his services (*id.* ¶¶ 34–37, 40, 51);

(4) they caused the Companies to lose a significant amount of assets and profits after causing Will Worthington to resign (*id.* ¶¶ 44–46, 51);

(5) they terminated or "[ran] off" other key Bank employee or officers who were instrumental to the Bank's profitability and customer relationships (*Brewer* Compl. ¶¶ 41, 46, 51);

(6) they failed to speak truthfully to the Companies' shareholders concerning the dispute with Worthington, including in a January 19, 2013 email from Stephens and at shareholder meetings in January 2013 and June 2013 (*id.* ¶¶ 37–39, 51) and

(7) they made statements in which they knowingly depreciated the value of WFH shares which negatively impact their actual value (*id.* ¶¶ 43, 51).

Frankly, even a cursory comparison of the relevant complaints makes it obvious that Everest cannot demonstrate as a matter of law that claims in the *Brewer* Lawsuit are not "based upon or aris[e] out of the same Wrongful Act or Interrelated Wrongful Acts" as those underlying the claims in the *Worthington* Lawsuit. While the *Brewer* Lawsuit adds two new defendants, the other six individual defendants are the same in each case. Everest emphasizes that the *Brewer* Lawsuit, unlike the *Worthington* Lawsuit, does not include claims by which any plaintiff seeks to recover personally under a "shareholder oppression" or "squeeze out" theory. But that does not alter the fact that both lawsuits do raise shareholders derivative claims, which by their nature all seek to recover on behalf of WFH and the Bank for injuries allegedly suffered by them. Everest attempts to cast the pleading in each case as merely "contain[ing] a listing of generalized grievances concerning the management of the Bank at the hands of [the] offers and director[s]." (Doc. 38 at 21). That characterization, however, borders on the disingenuous. The court agrees with Everest that alleged acts of corporate officers or directors are not necessarily "related" or "interrelated" just because it is claimed that such acts all caused or contributed to a single injury in the form of a drop in stock price. And it is also true that the *Brewer* Lawsuit contains allegations related to some events after the *Worthington* Lawsuit was filed. Nonetheless, many of the claims in the *Brewer* Lawsuit are unmistakably based on the very "same" wrongful acts pled in support of derivative liability in the *Worthington* Lawsuit. Such acts include those that allegedly forced Mr. Worthington out of the Companies; misrepresentations in an email that Stephens sent to shareholders dated January 19, 2013; misrepresentations made at a January 28, 2013, shareholders meeting and otherwise in relation to the defendants' rift with the Worthingtons and the performance of the Companies; refusing to negotiate in good faith with potential purchasers of the Bank; and making false statements demeaning the value of the Companies' stock. Even if all of the wrongful acts referenced in the *Brewer* Complaint do not entirely overlap with those in the *Worthington* Complaint, Everest has failed to show that the acts alleged in the two cases are not at least "interrelated" because they share "a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions." As a result, Everest has failed to establish that, for purposes of the "single claim" provision of the Everest Policy, the *Worthington* Lawsuit and the *Brewer* Lawsuit are not part of the same claim such that the latter might be deemed subject to coverage despite having been

filed after the policy period. Everest's motion for summary judgment is due to be denied.

## 2. Security National's Motion

Security National's motion for summary judgment is essentially the flip side of Everest's motion. The Security National Policy provided coverage to Plaintiffs from December 14, 2013 to December 14, 2014, that is, for the one-year period following the expiration of the Everest Policy. Accordingly, the Security National Policy was in force in April 2014 when the *Brewer* Lawsuit was filed. However, the Security National Policy, like the Everest Policy, expressly identifies itself as a "claims made" policy (Doc. 38–2 at 1), under which Security National promises to pay a "loss that is the result of a claim ... first made during the policy period." (*Id.* at 5 (emphasis omitted) [8]). The Security National Policy also contains an exclusion specifying that Security National is not liable to pay for a "loss in connection with ... any claim first made prior to the effective date of [the] policy period." (*Id.* at 11). Likewise, the Security National Policy also contains a "single claim" provision that is materially identical to that in the Everest Policy, previously set forth. (*See id.* at 15; *see also ante* at 18). Based upon those policy terms, Security National argues that its policy does not afford any coverage for the *Brewer* Lawsuit because it is part of the same "claim" arising out of the *Worthington* Lawsuit, which was filed prior to the policy period of the Security National Policy.

For the reasons stated in connection with Everest's motion, the court agrees with Security National that, under *Blackburn*, it is possible that *Brewer* Lawsuit would not trigger coverage under the Security National Policy if it is determined

that the *Brewer* Lawsuit is deemed, for purposes of the "single claim" provision, to be part of the same "claim" arising from the *Worthington* Lawsuit. Plaintiffs argue, however, that it is improper to even undertake that inquiry because, Plaintiffs say, this court may not look at the *Worthington* Complaint to assess whether Security National has a duty to advance defense costs. In support, Plaintiffs emphasize that, in *Tanner v. State Farm Fire & Cas. Co.*, 874 So.2d 1058 (Ala.2003), the Alabama Supreme Court stated that it "has never held that, even though the allegations of a complaint *do* allege a covered occurrence, the courts may consider evidence outside the allegations to disestablish a duty to defend." *Id.* at 1064 (emphasis original); *see also State Farm Fire & Cas. Co. v. Lacks*, 840 F.Supp.2d 1292, 1296 (M.D.Ala.2012). From there, Plaintiffs maintain that since the *Brewer* Lawsuit was filed within the policy period of the Security National Policy, it is a covered claim on its face, and this court may not "disestablish" Security National's obligation to advance defense costs based upon consideration of materials outside of the Security National Policy and the *Brewer* Complaint itself, including the *Worthington* Complaint. (Doc. 40 at 5–6).

Plaintiffs read *Tanner* too broadly. In *Tanner*, the Court held that, where the underlying complaint alleges facts showing a covered accident or occurrence, a court may not absolve the insurer of a duty to defend based on contrary extrinsic evidence tending to show either that the actual facts of the case did not give rise to a covered accident or occurrence or that the plaintiff on whose behalf such pleading was filed subjectively con-

---

**8.** As with the Everest Policy, the Security National Policy uses boldface to designate terms specifically defined by the policy, but

when quoting the Security National Policy, the court omits such emphasis.

ceived of his claim as one that would not be covered. *See Tanner,* 874 So.2d at 1064–1066. That makes sense because the duty to defend hinges upon the facts and claims that have been *asserted* against the insured in the underlying action, not "the ultimate liability of the insured" nor whether "evidence may eventually prove that the gravamen of the complaint was not a covered act or occurrence." *Tanner,* 874 So.2d at 1064–65 (citations omitted). Likewise, because the underlying complaint in *Tanner* had raised claims of unintentional fraud, which were covered under the policy, it mattered not that the plaintiff in the underlying action had later testified that he "felt" and "contended" that the insured had defrauded him intentionally, which would not be a covered claim. *Id.* at 1066; *accord Lacks,* 840 F.Supp.2d at 1296 (holding that, where underlying suit alleged negligent or reckless conduct, led to wrongful death, duty to defend was triggered notwithstanding later assertions in declaratory judgment action that shooting was likely intentional). However, even assuming that the duty to advance defense costs is subject to the same analysis as the duty to defend, Security National is not resorting to extrinsic evidence in an effort to *contradict* anything in the *Brewer* Complaint. Rather, Security National contends that the wrongdoing alleged in the *Brewer* Lawsuit is the same or sufficiently related to the wrongdoing alleged in the *Worthington* Lawsuit such that, for purposes of the Security National Policy, both form part of a single claim deemed made when the *Worthington* Lawsuit was filed, before the policy period. "An insurer *may* use extrinsic evidence to deny a duty to defend based on facts irrelevant to the merits of the underlying litigation, such as whether the claim was first made during the policy period, whether the insured party reported the claim to the insurer as required by the policy, or whether the underlying wrongful acts were related to

prior wrongful acts." *Biochemics, Inc.,* 963 F.Supp.2d at 70 (emphasis original); *accord Composite Structures, Inc. v. Continental Ins. Co.,* 560 Fed.Appx. 861, 865–66 (11th Cir.2014) (holding that, despite "the general rule [under Florida law] that the duty to defend is determined solely from the allegations of the complaint," evidence related to the date the insured gave notice to the insurer could be considered); *see also, e.g., HR Acquisition,* 547 F.3d at 1314–16 (applying Alabama law in holding that "prior litigation" exclusion defeated insured's claim for reimbursement of defense expenses based upon comparison of claims to those in earlier lawsuit); *Correll v. Fireman's Fund Ins. Companies,* 529 So.2d 1006 (Ala.1988) (holding that insurer had no duty to defend or indemnify based on extrinsic evidence that insured's notice to insurer came too late); *Watson v. Alabama Farm Bureau Mut. Cas. Ins. Co.,* 465 So.2d 394, 396–97 (Ala.1985) (same); *cf. Blackburn,* 667 So.2d at 670 (claims filed against insured outside of policy period were covered because they were part of "same claim" arising from lawsuits filed during the policy period in light of pleadings in prior lawsuits). Indeed, acceptance of Plaintiffs' argument would nullify nearly all policy provisions under which an insurer might argue that it has no duty to defend based upon any matter collateral to the substance of the underlying complaint, such as a lack of timely notice. That is not the law. Accordingly, the court may at summary judgment consider the *Worthington* Lawsuit, including its complaint, in order to compare its claims and allegations to those of the *Brewer* Lawsuit.

 As discussed in conjunction with Everest's motion, all of the individual defendants in the *Brewer* Lawsuit were also defendants in the *Worthington* Lawsuit, and the claims in both suits are in numerous instances based upon the very same

alleged acts and omissions. Plaintiffs do not seriously dispute this, going so far as to admit that "both lawsuits contain some factual allegations which were asserted in both the *Brewer* and *Worthington* Complaints" and that "such overlapping factual allegations" meet the policy definition of "interrelated wrongful acts" because "those facts have a common nexus."[9] (Doc. 41 at 6). Plaintiffs insist, though, that the *Brewer* Complaint also raises some "new and unrelated claims and parties" such that Security National must advance defense costs at least as to them. (Doc. 40 at 6). However, Plaintiffs overstate how much the *Brewer* Lawsuit is based on different alleged wrongdoing. For one thing, the fact that the named plaintiffs in the two cases are different is inconsequential. The Security National Policy deems multiple claims as being but a single claim where they are based on the "same wrongful act" or "interrelated wrongful acts." So if a given act or omission is alleged to have resulted in harm to different plaintiffs, it is still considered to give rise to a single claim. Moreover, the relevant claims in both lawsuits are derivative in nature, meaning that the plaintiffs are stockholders asserting that the defendants' wrongdoing visited injuries upon the Companies, rather than upon individual plaintiffs directly. *See generally Altrust Fin. Serv., Inc. v. Adams,* 76 So.3d 228, 241–42 (Ala.2011) (discussing the difference between direct and derivative claims made by shareholders).

In addition, many of the allegations from the *Brewer* Lawsuit that Plaintiffs frame as "wholly unrelated to the claims at issue in the *Worthington* Lawsuit" (Doc. 40 at 8) actually appear in that prior lawsuit. For example, Plaintiffs quote a paragraph in

the *Brewer* Complaint that cites false statements supposedly made by defendants Singleton and Karabinos at a shareholder meeting on January 28, 2013. (Doc. 40 at 8, quoting *Brewer* Compl. ¶ 38; *see also Brewer* Compl. ¶ 59). However, the same or materially similar allegations of fraudulent statements by Singleton and Karbinos at that meeting also form the basis of claims in the *Worthington* Complaint. (*See Worthington* Compl. ¶¶ 35, 59). Plaintiffs similarly cast as an "unrelated" allegation a claim made in the *Brewer* Lawsuit that, "after a battle for control of the Companies ..., [Mr.] Worthington was ultimately compelled to resign his position at the Companies," "his shares were redeemed and his involvement with the Companies ended." (Doc. 40 at 9, quoting *Brewer* Compl. ¶ 40). But the claim that defendants fought Mr. Worthington for control of the Companies, minimized his role, and eventually forced him out is quite obviously a primary focus of the *Worthington* Lawsuit, including as it related to derivative liability. (*See Worthington* Compl. ¶¶ 23, 26, 28–32, 36, 38–39, 44). Plaintiffs also rely upon allegations in the *Brewer* Lawsuit that defendants failed to adequately consider overtures to purchase the Bank and that they made false statements on several occasions understating the value of WFH shares, which could potentially adversely impact the price of the Bank in any sales negotiations. (Doc. 40 at 8–9, quoting *Brewer* Compl. ¶¶ 42, 43). But, again, such allegations are in the *Worthington* Lawsuit as well. (*Worthington* Compl. ¶¶ 36, 37).

In the end, Plaintiffs' argument that the *Brewer* Lawsuit is based at least in part upon wrongful acts unrelated to those underlying the *Worthington* Lawsuit rests

---

9. Technically speaking, Plaintiffs made this acknowledgment in reference to the term "interrelated wrongful acts" as defined in the Everest Policy. However, the Security National Policy defines the same term using materially similar language, as previously set forth in the text.

upon what amounts to a few allegations in the *Brewer* Complaint describing a handful of events between the filing of the two lawsuits, as follows: (1) that defendant directors made fraudulent representations at a shareholder meeting on June 10, 2013, related to the Bank's financial position, Worthington's role in any troubles, and the directors' plans and expectations for the Bank going forward (Doc. 40 at 8–9, quoting *Brewer* Compl. ¶ 39; *see also Brewer* Compl. ¶ 60); (2) that, after Mr. Worthington resigned, the defendants terminated "other key Bank employees" (Doc. 40 at 9, quoting *Brewer* Compl. ¶ 41); (3) that after Mr. Worthington left, the Bank sustained substantial losses in 2013 (Doc. 40 at 9–10, quoting *Brewer* Compl. ¶¶ 44–46); and (4) that Singleton was at some point replaced as the Bank's CEO by Stephens but that she and the other directors were also was "incompetent" and had "no viable business plan in place for growing the Bank" (Doc. 40 at 9–10, quoting *Brewer* Compl. ¶¶ 45–46). However, the allegations of fraud at the June 2013 shareholder meeting are but a variation on the same riff playing out of the preceding shareholders meeting in January 28, 2013, and from the email dated January 19, 2013, that Stephens sent to investors. Likewise, claims that the Singleton, Stephens, and all of the other defendant were incompetent and had led the Bank and WFH into financial straits by marginalizing Mr. Worthington and his allies is the very crux of both lawsuits. At a minimum, the alleged wrongdoing in the *Brewer* Lawsuit and the *Worthington* Lawsuit "have as a common nexus [a] fact, circumstance, situation, event, transaction" or a "series of facts, circumstances, situations, events or transactions" so as to fall within the broad definition of "interrelated wrongful acts" under the Security National Policy. Therefore, the court concludes that the record establishes as a matter of law that Security National owes no duty to advance

defense costs for the *Brewer* Lawsuit because it is, for purposes of the Security National Policy, part of the same claim as the *Worthington* Lawsuit, made prior to the policy period. To the extent that Security National's motion seeks summary judgment on that issue, it is due to be granted.

## V. CONCLUSION

Based on the foregoing, the court rules as follows: Everest's motion for summary judgment (Doc. 37) is **DENIED** in its entirety. Security National's motion for summary judgment (Doc. 35) is **GRANTED IN PART AND DENIED IN PART.** It is **DENIED** to the extent it seeks a determination that Security National owes no duty to indemnify Plaintiffs for any losses they might suffer by virtue of a judgment against them in the *Brewer* Lawsuit. Because that action remains pending in state court, resolution of such issue is premature. Security National's motion is **GRANTED**, however, insofar as it relates to claims by Plaintiffs that Security National owes them a duty to advance defense expenses in the *Brewer* Lawsuit.