**JAMES RIVER INSURANCE COMPANY, Plaintiff,**

v.

**ARLINGTON PEBBLE CREEK, LLC et al., Defendants.**

**Case No. 1:13cv224-MW/GRJ**

United States District Court, N.D. Florida, **Gainesville Division.**

Signed May 22, 2016

Jefferson M. Braswell, Scruggs & Carmichael PA, Gainesville, FL, for Campus Edge Condominium Association, Inc., Defendant.

Sina Bahadoran, Eric A. Hiller, Hinshaw & Culbertson LLP, Coral Gables, FL, for Plaintiff.

Mark Andrew Boyle, Sr., Molly Ann Chafe, Boyle & Leonard PA, Fort Myers, FL, James Arthur Bolling, Jr., Lanny Russell, Smith Hulsey & Busey, Jonathan Russell Huffman, Boyd & Jeherette PA, Jacksonville, FL, Lee Dilly Wedeking, III, Nelson Mullins Riley LLP, for Arlington Pebble Creek LLC and Arlington Properties, Inc., Defendants.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Mark E. Walker, United States District Judge

This is a declaratory judgment action concerning an insurance policy taken out by a condominium developer. Campus Edge Condominium Association sued Arlington Properties, Inc., the developer of a condominium, in state court, alleging that it had misrepresented the condition of the property and that hundreds of thousands of dollars in undisclosed repairs were required. Arlington Properties filed a claim with its liability insurer, James River Insurance Company, asking it to defend it and indemnify it in the lawsuit. James River subsequently filed this action, seeking a declaration that it is not under a duty to defend or indemnify Arlington Properties under the terms of the insurance policy. In addition to Arlington Properties, James River has named Arlington Pebble Creek, LLC—a single-asset pass-through entity owned by Arlington Properties—Campus Edge, and GLE Associates, Inc. as defendants.

This Court has considered, without hearing, the Arlington Defendants' Amended Motion for Partial Summary Judgment, ECF No. 65; Campus Edge's Response to and Motion for Summary Judgment, ECF

No. 67; James River's Motion for Final Summary Judgment, ECF No. 73; and the Arlington Defendants' Response in Opposition to Campus Edge's Motion for Summary Judgment [Doc. 67] and Renewed Motion to Dismiss, ECF No. 75. This Court has also considered the parties' numerous responses to these motions. *See* ECF Nos. 72, 74, 78, 80, 83, 84, 87, & 88.

After review, this Court finds that under the plain terms of the insurance policy James River is not obligated to defend or indemnify Arlington in the lawsuit against Campus Edge. It further finds that James River is entitled to recover the costs that it has already expended defending Arlington.

James River's and Campus Edge's motions are therefore granted, and the Arlington Defendants' motions are denied.

## I

This Court accepts the facts in the light most favorable to the non-movant. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir.2008). All reasonable doubts about the facts shall be resolved in favor of the non-movant. *Id.* The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the non-movant. *Lozman v. City of Riviera Beach*, 39 F.Supp.3d 1392, 1404 (S.D.Fla. 2014) (citations omitted).

## A

Campus Edge filed suit in Florida state court against Arlington Pebble Creek, LLC ("APC"), GLE Associates, Inc. ("GLE"), and Arlington Properties, Inc. ("Arlington"), in 2012. *See* ECF No. 62-1, at 2. The relevant allegations are set forth as follows.

Campus Edge is the management association for a 168-unit condominium complex in Gainesville, Florida. *Id.* at 3. Arlington is an Alabama corporation in the business of developing condominiums. *Id.* APC is a single-asset pass-through entity owned by Arlington, created for the purpose of purchasing the Pebble Creek Apartments in Gainesville and converting them into the Campus Edge Condominiums. *Id.*[1]

In November 2005, Arlington began analyzing property in Gainesville with the intention of buying an apartment complex and converting it into a condominium. *Id.* at 4. Arlington commissioned GLE, an engineering firm, to inspect the Pebble Creek apartment complex and prepare two separate reports—one accurately analyzing the complex's state of repair, and another reporting property conditions for the purposes of meeting statutory condominium law requirements. *Id.*

GLE reported that Pebble Creek was in terrible condition. *Id.* at 5–9. There was severe water damage and structural deterioration dating back several years, and no one had taken the necessary steps to fix it. *Id.* The "real" report that only Arlington possessed revealed this information, but the "other" report that Arlington intended to submit to state regulators and show to potential owners did not. *Id.*

Arlington moved forward and purchased the complex in February 2006. *Id.* at 9. During the time that it owned the complex, it made only repairs designed to hide the damage. *Id.* at 11–12. Arlington deliberately misrepresented the extent of the damage to condo purchasers. *Id.* at 10–12. Arlington transferred over ownership of the complex to the condo association, Campus Edge, in December 2008, without ever

---

**1.** Because APC is a mere pass-through entity owned by Arlington, this Order frequently refers to Arlington and APC collectively as "Arlington."

disclosing the extent of the structural damage. *Id.* at 13.

Campus Edge asserted claims against Arlington and APC for (1) violation of Florida's Condominium Act, ECF No. 62-1 at 17–18; (2) fraudulent non-disclosure, *id.* at 18–21; (3) negligent misrepresentation, *id.* at 21–23; and (4) breach of the implied warranties of fitness and merchantability, *id.* at 26–27.[2]

### B

After it was sued, Arlington filed a claim on its commercial general liability insurance policy that it had purchased from James River. The policy was effective from November 1, 2005 to November 1, 2006. ECF No. 62-2, at 2. APC was added to the policy after it was created on February 6, 2006. *Id.* at 80.

The insurance policy provides, in operative part,

**1. Insuring Agreement**

 **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the Insured against any 'suit' seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result ...

 **b.** This Insurance applies to "bodily injury" and "property damage" only if:

 (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

 (2) The "bodily injury" or "property damage" occurs during the policy period ...

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions ...

**17.** "Property damage" means:

 **a.** Physical Injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical Injury that caused it; or

 **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it ...

*Id.* at 6, 19, 20.

The policy also specifies that "Where there is no coverage under this policy, there is no duty to defend." *Id.* at 31.

### C

On March 23, 2012, James River sent Arlington a letter acknowledging its receipt of the complaint in Campus Edge's lawsuit and stating that "James River will defend Arlington but under a complete reservation of rights since there are significant questions regarding the existence of coverage in this intentional concealment action." ECF No. 65-1, at 7.

In the section of the letter titled "Reservation of Right to Amend," James River stated that

By continuing the investigation and handling of this claim subject to reservation of rights, James River does not waive or intend to waive any of its rights, including but not limited to the future right to withdraw, supplement, or modify any

---

**2.** Campus Edge also asserted several claims against GLE, which are not relevant here.

part of this letter, disclaim coverage, or institute a declaratory judgment action for a judicial determination regarding the propriety of its coverage decision and *seek reimbursement of all attorney's fees and costs incurred to defend Arlington.* James River specifically reserves all of these rights. By accepting this defense under reservation of rights, Arlington acknowledges and accepts all of the terms of this reservation of rights.

*Id.* at 21–22 (emphasis added). A similar provision in an October 31, 2013 letter acknowledging receipt of the amended complaint adding Arlington as a defendant states

By handling this matter under a complete reservation of rights, James River does not waive or intend to waive the future right to modify this correspondence in any way or withdraw it altogether. Stated differently, James River does not waive or intend to waive any of its rights, including but not limited to the future right to withdraw, supplement, or modify any part of this letter, or institute a declaratory Judgment action for a judicial determination regarding the propriety of our coverage decision and *seek reimbursement of all attorney's fees and costs incurred to defend Arlington Pebble Creek, LLC and Arlington Properties, Inc. if there is a declaration of no coverage.* By accepting this defense you acknowledge and accept the terms of this reservation of rights.

*Id.* at 36(emphasis added).

On June 2, 2014, Arlington's counsel sent a letter to James River, stating that

James River does assert, however, that it reserves the right to seek reimbursement of any defense related payments it

may make in connection with the referenced matter with respect to claims not covered by the Policy. Please be advised that the Policy does not give James River a right to such recovery from the Insured or any other related entity or individual. The Insured and such related entities and individuals herby [sic] *specifically and categorically reject such reservation* and any assertion by James River that its acceptance of the defense offered by James River creates any right, contractual or otherwise, to such recovery.

*Id.* at 39 (emphasis added).

### D

James River filed suit in this Court against Arlington and APC, seeking a declaration that it has no duty to defend or indemnify Arlington, and also seeking reimbursement of attorneys' fees and costs incurred to defend Arlington in the underlying action. ECF No. 1.

Arlington later added Campus Edge as a defendant because the parties agreed that Campus Edge was an indispensable party. *See* ECF Nos. 20 & 21. This Court subsequently determined that Campus Edge was properly aligned as a defendant, rather than a plaintiff, and that subject matter jurisdiction was properly established given complete diversity of citizenship in this case. ECF No. 60. However, this Court dismissed the pending complaint because it failed to adequately allege the citizenship of the members of APC. *Id.* The Third Amended Complaint, ECF No. 62, now pending before the Court, appears to have corrected these defects.[3]

James River and Arlington have now filed cross motions for summary judgment.

---

**3.** The Third Amended Complaint asserts eleven counts for declaratory judgment, seeking specific declarations regarding different provisions and exclusions under the insurance policy. This Court construes these claims as a single count for a declaration that James River has no duty to defend or indemnify Arlington in the underlying lawsuit.

Campus Edge has also filed a motion for summary judgment, stating that it believes that James River does not have a duty to defend and requesting that it be dismissed from the lawsuit.

## II

As a preliminary matter, Arlington has filed a renewed motion to dismiss for lack of subject matter jurisdiction. It argues that, based on subsequent developments in this case, Campus Edge is no longer properly aligned as a defendant, and must be realigned as a plaintiff, thus destroying complete diversity and subject matter jurisdiction.

■ Arlington's motion must be summarily denied. Simply put, it does not matter how Campus Edge's position in this action changes, evolves, or becomes apparent as the suit progresses. "[T]he facts which form the basis for realignment must have been in existence at the time the action was commenced. Subsequent events will not deprive the court of its jurisdiction over parties properly aligned." *Am. Motorists Ins. Co. v. Trane Co.*, 657 F.2d 146, 149 (7th Cir.1981) (citing 3A Moore's Federal Practice ¶ 19.03(1) (2d ed. 1980)); *see also Gaines v. Dixie Carriers, Inc.*, 434 F.2d 52, 54 (5th Cir.1970) ("[D]iversity jurisdiction is determined as of the commencement of the action. Once attached it continues to final disposition of all matters properly before the court, regardless of changes in citizenship of parties, or changes in parties brought about by intervention or substitution.") (citations omitted).[4]

Arlington has pointed to no facts regarding Campus Edge's alignment *at the time jurisdiction was established* that were not apparent when this Court previously addressed this issue, *see* ECF No. 60. Arling-

ton is merely seeking a second bite at the apple, and this Court will not allow it.

## III

The parties dispute which state's law governs the insurance contract. The contract was delivered to Arlington and signed in Alabama, but the insured property is located in Florida. James River argues that Alabama law governs, while Arlington argues that Florida law controls.

■ A federal court sitting in diversity will apply the choice-of-law and conflict-of-laws rules of the forum state. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir.2007). Florida law is arguably unsettled regarding which state's law to apply in interpreting contracts for insurance on real property. James River argues Florida courts must apply the rule of *lex loci contractus*—that the law of the jurisdiction where the contract was executed governs—and so, in this case, Alabama law governs. *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla.2006) ("[I]n determining which state's law applies to contracts, we have long adhered to the rule of lex loci contractus."). Arlington, however, argues that *Roach*'s holding does not apply to insurance contracts concerning real property, but only to non-fixed policies like automobile and life insurance. Instead, it argues, this Court should apply the "law of the situs"—in this case, Florida law, since the real property was located in Florida—based on the Eleventh Circuit's prediction that the Florida Supreme Court would do so if presented with such a case. *See Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119–21 (11th Cir.1990) ("We do not believe, however, that the Florida Supreme Court would apply the antiquated

---

4. Decisions of the Fifth Circuit handed down prior to October 1, 1981 are binding within the Eleventh Circuit. *Bonner v. City of Prich-* *ard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

*lex loci contractus* rule to the instant case.").

 This Court, however, need not decide the issue. As a threshold issue in cases where the parties dispute the choice of law, courts must first determine whether the case involves a "true" conflict of laws. *Tune v. Philip Morris Inc.,* 766 So.2d 350, 352 (Fla. 2d DCA 2000). A "true" conflict exists when two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce different results. *Chapman v. DePuy Orthopedics, Inc.,* 760 F.Supp.2d 1310, 1313 (M.D.Fla.2011) (citations and quotations omitted). By contrast, a false conflict exists when the laws of different states are (1) the same, (2) different but would produce the same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws. *Tune,* 766 So.2d at 352. Where a false conflict exists, the court should avoid the conflicts question and simply decide the issue under the law of each of the interested states. *See Fioretti v. Mass. Gen. Life Ins. Co.,* 53 F.3d 1228, 1234 (11th Cir.1995).[5]

 Here, there is a "false conflict" because, for the reasons explained below, Alabama law and Florida law do not significantly differ in their interpretation of the insurance contract, and application of either state's law would lead to the same outcome. Accordingly, this Court need not decide which law applies.[6]

## IV

James River seeks a declaratory judgment that, based on the terms of the contract, it has no duty to defend or indemnify Arlington in the underlying lawsuit against Campus Edge. Arlington in turn argues that under the terms of the agreement James River is obligated to pay for its legal defense, and that determination of the duty to indemnify is premature before the underlying lawsuit is resolved on its merits.

 Under Alabama law,
It is well settled that an insurer's duty to defend is more extensive than its duty to indemnify. Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint. If the allegations of the injured party's complaint show an accident or an occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured ... When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy ...
If the allegedly injured person's complaint against the insured alleges a cov-

---

**5.** *Cf. Wells Fargo Bank, N.A. v. Barber,* 85 F.Supp.3d 1308, 1315 n. 6 (M.D.Fla.2015) (noting some mixed authority regarding how federal courts ought to address false conflicts, but observing that federal courts in Florida have widely adopted the *Fioretti* approach).

**6.** This Court notes, however, that nearly every court to consider the issue has found that *Roach* abrogated the *Shapiro* rule with respect to all contracts, even ones involving real

property, and that *lex loci contractus* governs. *See, e.g., Liberty Mut. Ins. Co. v. Festival Fun Parks, LLC,* No. 12–62212–CIV, 2013 WL 4496511, at *4–5 (S.D.Fla. Aug. 22, 2013) (Rosenbaum, J.) (collecting cases). *But see Scratch Golf, LLC v. Lexington Ins. Co.,* No. 08–60815–CIV, 2009 WL 1287963, at *3 (S.D.Fla. May 6, 2009) (noting that *Shapiro* controlled the analysis but speculating that it may be overruled in light of *Roach*).

ered accident or occurrence, then the insurer owes the duty to defend even though the evidence may eventually prove that the gravamen of the complaint was not a covered accident or occurrence. If the complaint against the insured does not, on its face, allege a covered accident or occurrence, but the evidence proves one, then the insurer likewise owes the duty to defend. The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between [the injured person] and the insured prove a covered accident or occurrence.

[A]n ambiguous insurance policy is to be construed liberally in favor of the insured and strictly against the insurer. *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So.2d 1006, 1009–11 (Ala.2005) (citations, quotations, and alterations omitted).

▮▮▮ Similarly, in Florida,

It is well settled that an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage. The duty to defend must be determined from the allegations in the complaint.

The duty to defend is of greater breadth than the insurer's duty to indemnify,[7] and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless. Indeed, when the actual facts are inconsistent with the allegations in the complaint, the allega-

tions in the complaint control in determining the insurer's duty to defend. Any doubts regarding the duty to defend must be resolved in favor of the insured. *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So.2d 435, 442–43 (Fla.2005) (citations, quotations and alterations omitted).

After a thorough review of the insurance contract and Campus Edge's underlying complaint, this Court finds that James River does not have a duty to defend because the allegations do not implicate any coverage under the policy.

### A

▮▮▮ The insurance agreement states that James River will pay damages—and defend potential claims—"that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." ECF No. 62-2, at 6. The insurance applies only to "property damage" that is "caused by an 'occurrence' that takes place in the 'coverage territory.'" *Id.* An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 19. "Property damage" includes "Physical Injury to tangible property, including all resulting loss of use of that property." *Id.* at 20.

The underlying complaint, however, does not include any claims implicating "property damage," much less property damage caused by an "occurrence." None of the claims seek any damages arising "because of ... 'property damage'"; that

---

7. The insurance policy contains a "Duty to Defend" provision, which states "Where there is no coverage under this policy, there is no duty to defend." ECF No. 62-2, at 31. The parties dispute the significance of this language and whether it means that the duty to defend and the duty to indemnify are coterminous under the contract. This Court need not address the issue, because the motions for summary judgment may be resolved on other grounds. *See, e.g., McCreary v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 758 So.2d 692, 695 (Fla. 4th DCA 1999) ("[A]n insurer has no duty to defend a suit against an insured if the complaint upon its face alleges a state of facts that fails to bring the case within the coverage of the policy.") (citations and quotations omitted).

is, they do not seek any damages from "physical injury to tangible property" "caused by" an "accident." Instead, they seek damages arising from Arlington's alleged nondisclosure of *already existing* property damage.[8],[9] The nondisclosure did not *cause* the property damage.

None of the four causes of action that Campus Edge asserts seek to recover for any "occurrence" that "caused" property damage, but instead seek economic damages resulting from Arlington's own intentional or negligent actions. Liability for a claim for violation of the Condominium Act, § 718.616, Florida Statutes, like claims for fraudulent non-disclosure and negligent misrepresentation, is premised on Arlington's *failure to disclose* information in its report; the *cause* of the underlying property damage is irrelevant. *See* § 718.616(1), Fla. Stat. (2015) ("Each developer ... *shall prepare a report* that discloses the condition of the improvements and the condition of certain components.") (emphasis added). Likewise, liability for a claim for the breach of the implied warranties of fitness and merchantability is premised on Arlington's action in *selling* property that was unfit; the *cause* of any

underlying property damage is, again, background information that is quite beside the point in determining liability. *See Maronda Homes, Inc. v. Lakeview Reserve Homeowners Ass'n, Inc.*, 127 So.3d 1258, 1268 (Fla.2013) ("[A] warranty is breached if the residence *is rendered* not reasonably fit for the ordinary or general purpose intended.") (emphasis added).

Arlington's alleged actions thus did not *cause* the physical damages to the property; they caused economic damage to the individuals who subsequently purchased the units. But the insurance policy, again, only covers suits seeking as damages "sums that the insured becomes legally obligated to pay" "because of" "physical injury to tangible property," "*caused by* an 'occurrence.'" ECF No. 62-2, at 6, 19, 20 (emphasis added).

■■ Courts have consistently found that torts involving misrepresentation do not implicate "property damage" under commercial liability insurance policies like the one issued by James River, and that such torts are not sufficiently unintentional to constitute an "accident." *See, e.g., O'Dell v. Pac. Indem. Co.*, 619 Fed.Appx. 828, 832

---

8. Arlington argues that Campus Edge seeks "damages arising out of negligent repairs," ECF No. 80, at 16, but that is not plausible from any reasonable reading of the complaint. As explained below, the four counts asserted in the underlying complaint against Arlington—violation of the Condominium Act, fraudulent misrepresentation, negligent misrepresentation, and breach of the implied warranty of fitness and merchantability—are all premised not on the negligent repairs that occurred during Arlington's ownership, but on Arlington's alleged nondisclosure regarding the state of the building.

9. James River repeatedly argues that this Court should consider Campus Edge's admissions that it is not seeking to recover for property damage, only for economic damages caused by misrepresentation, as well as Arlington's argument in the underlying lawsuit

that the case is about economic damages. This Court has not done so, as that would be improper. *See McCreary*, 758 So.2d at 695 ("[T]he duty of an insurer to defend is determined *solely* by the allegations of the complaint against the insured.") (emphasis in original) (citations and quotations omitted); *Hartford*, 928 So.2d at 1009–10 ("Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint ... this Court has never held that, even though the allegations of the complaint *do* allege a covered accident or occurrence, the courts may consider evidence outside the allegations to disestablish the duty to defend.") (citations and quotations omitted). Rather, this Court has made its determination based solely on the allegations themselves.

(11th Cir.2015) ("[C]ases are virtually unanimous in their holdings that damages flowing from misrepresentation and/or fraud have no basis in property damage ... [T]he only cognizable damages from such torts are economic and contractual in nature and as such do not fall within the scope of coverage afforded by policies like [the one at hand].") (citations and quotations omitted) (applying Georgia law but citing cases from other jurisdictions).[10]

For example, in *State Farm Fire & Casualty Co. v. Gwin*, 658 So.2d 426 (Ala. 1995), two homeowners were sued for negligently failing to disclose a termite infestation and other damages when they sold their home. *Id.* at 427. Their insurer sought a declaration that it had no duty to defend. The Alabama Supreme Court, interpreting an insurance policy with nearly identical operative language as the policy at issue here,[11] emphatically held that the alleged misrepresentations "did not *cause* the property damage" and granted summary judgment in favor of the insurer. *Id.* at 428 (emphasis in original). The court relied in part on precedent holding that "the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time the complaining party was actually damaged," in determining that the damages from the misrepresentations necessarily occurred after the property had already been sold and the insurance policy was no longer in effect. *Id.* (citations and quotations omitted).

Courts applying Florida law have consistently reached similar conclusions. *See, e.g., S.-Owners Ins. Co. v. Herrera*, 116 F.Supp.3d 1310, 1313 (M.D.Fla.2015) ("[The insured's] non-disclosure was not the 'occurrence' which led to the 'property damage,' and is not, therefore, covered by the Plaintiffs' insurance policies."); *St. Paul Fire & Marine Ins. Co. v. Cypress Fairway Condo. Ass'n, Inc.*, 114 F.Supp.3d 1231, 1239 (M.D.Fla.2015) ("The alleged cause of damage asserted in Count VI was [the insureds'] representations to the Association—representations about the state of the buildings did not cause water intrusion and the resultant property damage. Further, representations are not accidents."); *Colony Ins. Co. v. Montecito Renaissance, Inc.*, No. 8:09–CV–1469–T–30MAP, 2011 WL 4529948, at *5 (M.D.Fla. Sept. 30, 2011) ("Even assuming that a 'negligent misrepresentation' can constitute an 'occurrence' in Florida for purposes of coverage under a CGL policy, it is nonetheless clear here that the alleged negligent misrepresentation did not *cause property damage.*") (emphasis in original).

■ Finally, there is the matter of the "pre-existing damage" exclusion in the policy. That exclusion reads as follows:

> This Policy does not apply to ... "Property Damage" which begins or takes place before the inception date of coverage, whether such ... "Property Damage" is known to an Insured, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the "occurrence" causing such "Property Damage" may be or involve a continuous or re-

---

10. The policy at issue in *O'Dell* was substantially identical to the policy at issue here; it covered "damages a covered person is legally obligated to pay for personal injury or property damage which take[s] place anytime during the policy period and are caused by an occurrence." 619 Fed.Appx. at 830.

11. There, the insurance applied "[i]f a claim is made or suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence." *Gwin*, 658 So.2d at 427.

peated exposure to substantially the same general harm.

ECF No. 62-2, at 30. Even assuming for a moment that some of the physical damage to the property is implicated by Campus Edge's complaint, any such damage caused by continued deterioration of the premises that began before the coverage period would clearly not be covered under the policy. Only damage caused by events taking place *after* the policy went into effect would be covered.

## B

Arlington argues that such damage is implicated by Campus Edge's complaint. Arlington claims that the "Underlying Complaint, 'at least marginally and by reasonable implication,' alleges that properly-insured subcontractors working for one of the Arlington entities on existing apartment buildings ... did 'maintenance' work ... on the Complex during the CGL Policy period in 2006, and that they caused property damage to other structures on premises within the common areas of the Complex."[12] ECF No. 65, at 21. It also cites a litany of instances in which the underlying complaint contains allegations concerning damage to the property, including:

- Arlington Properties retained an engineering firm, GLE Associates, Inc. ("GLE"), in November 2010 to prepare certain reports concerning the Complex, including "an inspection report for a detailed analysis of items in need of repair." [Doc. 62-1. ¶ 10].
- One of GLE's reports was a Property Condition Assessment dated December 20, 2005 (the "PCA Report"). [Doc. 62-1, ¶ 13].
- GLE's PCA Report recommended maintenance work and repairs to address or prevent moisture intrusion involving the roof, stairwells, handrails, painted surfaces, balconies, and stucco expansion joints. [Doc. 62-1, PCA Report, pgs. 2-5].
- The PCA Report specifically describes some of these activities as "Maintenance." [Id.].
- Arlington Defendants and/or their contractors and subcontractors did work at sites in the Project that are now affected by water intrusion, "deteriorating structures," and "structural rot." See [Doc. 62-1, ¶¶ 23, 26(c), and 30]. This work allegedly included "numerous water damage repairs performed under the direction of Arlington's employees during the management and administration of the complex from purchase [in February 2006] to delivery to [Campus Edge in December 2008]." [Doc. 62-1. ¶ 26(c) ].
- GSE's report identifies problems at sites GLE had suggested the Arlington Defendants maintain or repair, such as stairwells, caulked joints, balconies, and handrails. [Doc. 62-1, pp. 99-100].
- In its second report dated July 8, 2013, GSE discusses evidence that the Arlington Defendants had completed work suggested by GLE, including GLE's 2008 draft "evaluation report" discussing "[GLE's] observations of repairs"; correspondence between the Arlington Defendants and GLE on April 26, 2006 (within the CGL Policy period) regarding "specifications and details to properly caulk and paint the buildings and repair the flashing and handrails"; and "information about completed painting and exterior drywall repairs from ... maintenance

---

**12.** Florida courts have found a duty to defend where the allegations show, "at least marginally and by reasonable implication," that the claims fall within the insurance policy. *See, e.g., Klaesen Bros. v. Harbor Ins. Co.,* 410 So.2d 611, 613 (Fla. 4th DCA 1982).

personnel." [Doc. 62-1, Ex. 8, Doc. 62-1, pg. 132 at ¶¶ 4-7; pg. 135 at ¶ 3, pg. 137 at ¶¶ 5 and 7, and pg. 138 at ¶ 7].

- Additionally, GSE relies upon correspondence between GLE and Arlington from March 2008, which says, in relevant part:

[A]lthough it appears that some sealant repair work has been performed since GLE's previous site visit, it does not appear that the recommended sealant repairs were consistent throughout the project site. As a result, there appears to be ongoing moisture intrusion at some of the balcony edge conditions... Observed damage that appears directly attributed to these conditions include paint and drywall compound delamination, in some cases exposing the underlying drywall and corner beads.

[Id. at pg. 137, ¶ 7].

ECF No. 80 at 12-13.

In other words, Arlington argues that because the underlying complaint contains some mention of property damage, even though that damage is not directly relevant to the claims alleged, the complaint "alleges facts that fairly and potentially bring the suit within policy coverage." *Jones*, 908 So.2d at 442-43 (citations, quotations and alterations omitted).

■ Arlington's argument is not well taken. It cites no direct authority for its argument, nor can it. Its argument fails because there is no "reasonable implication" by which the facts regarding the property damage might be relevant to Campus Edge's claims for misrepresentation. It would be absurd to allow background facts having no direct bearing on the alleged claims to implicate an insurer's duty to defend. *Cf. Am. Safety Indem. Co. v. T.H. Taylor, Inc.*, 513 Fed.Appx. 807, 811 (11th Cir.2013) (citing *Ladner & Co. v. S. Guar. Ins. Co.*, 347 So.2d 100, 103 (Ala. 1977)) ("If proof of the facts alleged in the governing pleading would necessarily establish a non-covered intentional tort, the insurer would not be obliged to defend."); *James River Ins. Co. v. Med Waste Mgmt., LLC*, 46 F.Supp.3d 1350, 1358 (S.D.Fla.2014) ("[W]here claims are cast wholly within policy exclusion, there is no duty to defend.") (citations omitted).

It doesn't matter whether, based on the allegations, Campus Edge *could* have brought a claim for "property damage" caused by an "occurrence." It didn't. Facts matter. The insurance contract does not require James River to defend against imaginary claims.

Courts have rejected an analogous position and held that claims that have no basis in the alleged facts do not implicate a duty to defend. *See, e.g., Hartford*, 928 So.2d at 1012. It follows that facts that have no bearing on the claims being brought likewise do not give rise to such a duty. Further, courts have routinely implicitly rejected Arlington's argument. In *Gwin*, the underlying complaint alleged termite infestation and other physical damage to the house, but the court did not even consider that this "property damage" had anything to do with the allegations for misrepresentation. *Gwin*, 658 So.2d at 427. Similarly, in *O'Dell*, the underlying complaint contained factual allegations regarding flood damage and failure to repair the damage during the time of the insureds' policy, but the court rejected the insureds' argument that the suit against them "also sought the 'cost of repairs' for physical damage due to flooding and septic problems," finding instead that the damages sought were purely economic and thus excluded from the policy. *O'Dell*, 619 Fed. Appx. at 831. And in *Baron Oil Co. v. Nationwide Mutual Fire Insurance Co.*, 470 So.2d 810 (Fla. 1st DCA 1985), the court emphasized that it was the "counts" or "causes of action," not merely the facts themselves, that determine coverage; the

court held that where an amended complaint dropped the causes of action that gave rise to the duty to defend, the insurer's duty to defend terminated. *See* 470 So.2d at 815 ("[W]here an amended complaint alleges facts that clearly bring the entire cause of action within a policy exclusion, and the amended complaint contains *no additional counts or causes of action which show coverage*, the allegations in the amended complaint control and the insurer's duty to defend comes to an end.") (emphasis added).

The cases on which Arlington relies are inapposite, because in each of those cases, the underlying plaintiff brought claims for actual *property damage*, not just a misrepresentation concerning property damage. The underlying plaintiffs all sought to recover for "property damage" caused by an "occurrence." *See, e.g, Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 811 (11th Cir.1985) (suit brought against contractor for negligently constructing a building); *Voeller Const., Inc. v. S.-Owners Ins. Co.*, No. 8:13–CV–3169–T–30MAP, 2014 WL 1779289, at *1 (M.D.Fla. May 5, 2014) (suit brought against contractor for building code violations resulting from negligent construction); *Axis Surplus Ins. Co. v. Contravest Constr. Co.*, 921 F.Supp.2d 1338, 1341 (M.D. Fla. 2012) (suit brought against contractor for negligent construction); *Trovillion Constr. & Dev., Inc. v. Mid–Continent Cas. Co.*, No. 6:12–CV–914–ORL–37, 2014 WL 201678, at *2 (M.D.Fla. Jan. 17, 2014) (suit brought against contractor for, among other things, building code violations and seeking damages for "the cost of rectifying the building code violations as well as the cost of repairing damage that the violations caused to other property"); *Sarasota Residences,*

*LLC v. Mt. Hawley Ins. Co.*, Case No. 2009 CA 009990 NC (Fla. 12th Jud. Cir. Mar. 22, 2011) (unpublished), ECF No. 65-3, at 2 (claims for, among other things, violation of building codes resulting from negligent construction).

But here, Campus Edge is not suing Arlington for negligent construction, building code violations, or any other claim that seeks recompense for any damage caused to any property by any accident. Campus Edge is suing Arlington for misrepresentation, and its misrepresentation did not cause any "property damage." Campus Edge is seeking economic damages for misrepresentation, and James River no duty to defend against its claims.

### C

Because this Court has found that there is no duty to defend under the plain language of terms of the insurance agreement, it need not address the parties' remaining arguments.

■ The claims brought by Campus Edge do not fall within Arlington's insurance policy, and so James River is entitled to a declaration that it has no duty to defend or indemnify Arlington as against those claims.[13] James River's and Campus Edge's motions for summary judgment are granted, and Arlington's motion is denied, as to the declaration.

### V

■ Lastly, the parties dispute whether, given that James River has no duty to defend, it is entitled to recover the costs that it has already expended defending Arlington.

---

13. The duty to defend is broader than the duty to indemnify, so where there is no duty to defend, there is no duty to indemnify. *See Trailer Bridge, Inc. v. Ill. Nat'l Ins. Co.*, 657 F.3d 1135, 1146 (11th Cir.2011) ("[A] court's determination that the insurer has no duty to defend requires a finding that there is no duty to indemnify.")

The insurance policy is silent as to whether James River may recover its expended costs in the event that it was determined not to have a duty to defend. Prior to undertaking the defense, on March 23, 2012, James River stated that it would undertake the defense only under a reservation of the right to recover its costs if it were determined not to have such a duty to defend, and it against reiterated its position on an October 31, 2013. *See* ECF No. 65-1, at 22, 36. On June 2, 2014, Arlington's counsel sent James River a letter purporting to reject any right to reimbursement. *Id.* at 39.

James River argues that it effectively reserved the right to seek reimbursement by so stating in its letter undertaking the defense. Arlington argues that James River could not reserve a right which did not exist under the insurance contract, and even if it did, Arlington rejected its right to reimbursement and is under no obligation to pay it.

A

Under Florida law, James River wins. It effectively reserved its right to seek reimbursement when it offered to defend Arlington, and Arlington accepted its defense, so it is entitled to reimbursement now that it has been determined that it was never under a duty to defend. *See Colony Ins. Co. v. G & E Tires & Serv., Inc.*, 777 So.2d 1034, 1039 (Fla. 1st DCA 2000) ("Colony timely and expressly reserved the right to seek reimbursement of the costs of defending clearly uncovered claims, which it consistently identified as such. Having accepted Colony's offer of a defense with a reservation of the right to seek reimbursement, G & E ought in fairness make Colony whole, now that it has been judicially determined that no duty to defend ever existed."); *Jim Black & Associates, Inc. v. Transcon. Ins. Co.*, 932 So.2d 516, 518 (Fla. 2d DCA 2006) ("Now that it has been determined that Transcontinental never had a duty to defend, Transcontinental is entitled to reimbursement."); *cf. Wendy's of N.E. Fla., Inc. v. Vandergriff*, 865 So.2d 520, 522 (Fla. 1st DCA 2003) (finding that where insurer "expressed no such reservation of rights to attorney's fees and costs to [insured] when undertaking its defense, *Colony Insurance* is inapplicable," and that the insurer's "unilateral attempt to assert such right some 16 months after accepting [the insured's] defense has no legal effect").

Arlington argues that because it was never given a formal opportunity to reject James River's terms, and because it eventually sent a letter rejecting the right to reimbursement, it is not obligated to pay. In support, it cites *Nationwide Mutual Fire Insurance Co. v. Royall*, 588 F.Supp.2d 1306 (M.D.Fla.2008), which held that "absent express notice that a failure to object would constitute an acceptance, the insured's acquiescence in [the insurer's] offer[ ] does not constitute an acceptance." *Id.* at 1318. The court reasoned that, because neither *Colony* nor *Jim Black* addressed the issue specifically, it was necessary to predict that the Florida Supreme Court would impose such a requirement if confronted with the question. *Id.*

This Court respectfully disagrees with the *Royall* court's reasoning. Both *Colony* and *Jim Black* are directly on point and do not suggest that a reservation of rights is ineffective if it does not provide a date-certain by which the insured can reject the offer. There is no indication, other than the *Royall* court's speculation, that the Florida Supreme Court would disagree. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1020–21 (11th Cir.2014) ("In interpreting Florida law, we look first for case precedent from the Florida Supreme Court. Where we find none, we are bound to adhere to decisions of the state's inter-

mediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise.") (citations and quotations omitted); *accord Certain Interested Underwriters at Lloyd's, London Subscribing to Certificate of Ins. No. 9214 v. Halikoytakis*, No. 8:09–CV–1081–T–17TGW, 2011 WL 7305888, at *3 (M.D.Fla. Dec. 21, 2011), *report and recommendation adopted*, No. 8:09–CV–1081–T–17TGW, 2012 WL 487464 (M.D.Fla. Feb. 2, 2012) ("[T]he controlling decisions of Florida's intermediate courts of appeal are contrary to [*Royall's*] principle. The reservation of rights letters in both *Jim Black* and *Colony* contained no language stating a time limit for accepting or rejecting the defense, and in both cases reimbursement was awarded.").

Moreover, Arlington *never* rejected James River's defense—it only purported to reject its reservation of rights, and it only did this *two years* after James River undertook the defense. It continued to accept James River's defense, which was predicated on an offer that included a reservation of rights. *Cf. Jim Black*, 932 So.2d at 518 ("Jim Black agreed to defense counsel and accepted the defense provided; thus, Jim Black 'necessarily agreed to the terms' on which Transcontinental extended its offer to provide a defense."). Arlington has no right to unilaterally alter the terms of the valid contract. James River is thus entitled under Florida law to seek reimbursement of its defense costs now that it

has been determined that it never owed a duty to defend.

**B**

▮ The issue is less clear under Alabama law. This Court has not found, nor have the parties cited,[14] any authority specifically stating whether Alabama allows insurers to seek reimbursement for defense costs under a reservation of rights that are not specifically enumerated in the insurance contract.[15] This question has been answered differently in different jurisdictions. *See Cincinnati Ins. Co. v. Grand Pointe, LLC*, 501 F.Supp.2d 1145, 1161 (E.D.Tenn.2007) (noting a "conflict among the jurisdictions concerning whether reimbursement of defense costs is allowed when the insurance policy does not specifically reserve the right to reimbursement").

So this Court "must predict how the highest court [of Alabama] would decide this case." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir.2011). The best clue this Court has found is the Alabama Supreme Court's decision in *Mt. Airy Insurance Co. v. Doe Law Firm*, 668 So.2d 534 (1995). In that case, the Alabama Supreme Court decided that an insurer could *not* receive reimbursement from its insured "for a payment it ... made to its insured to settle a claim of a third party against its insured, [when] it [wa]s later determined that the insured's liability policy did not provide indemnity

---

14. The parties were given the specific opportunity to brief the issue. *See* ECF No. 86.

15. The cases that Arlington cites for the proposition that insurers are not entitled to seek recovery for costs under Alabama law are inapposite. The court in *Sharp Realty & Management, LLC v. Capitol Specialty Insurance Corp.*, No. CV–10AR–3180–S, 2012 WL 2049817, at *19 (N.D.Ala. May 31, 2012), provided only a cursory discussion of the in-

sured's right to reimbursement and did not cite any binding Alabama authority in support of its conclusion. The court in *Worthington Federal Bank v. Everest National Insurance Co.*, 110 F.Supp.3d 1211, 1221 (N.D.Ala. 2015), discussed an insurer's obligation to advance costs and did not address the issue of whether an insurer subsequently found to have no duty to defend may seek reimbursement of its defense costs under a reservation of rights.

coverage for the third party's claim." 668 So.2d at 535, 539.

The facts of the case were, in many relevant ways, similar to the facts of this case. The insured, a law firm, feared that it was about to be sued by one of its former clients for malpractice. *Id.* at 535–36. It noticed its malpractice insurer of the possible claim; in response, the insurer filed a declaratory judgment action in federal court seeking a determination of whether the law firm would be covered given the nature of the former client's malpractice claim. *Id.* Soon thereafter, the former client offered to settle with the law firm, an offer which the law firm communicated to the insurer. *Id.* at 536. The law firm

expressed its consent to the settlement, and made a demand upon Mt. Airy[, the insurer,] to pay the portion of the settlement above the policy's $5,000 deductible. The Doe law firm further informed Mt. Airy that Davison[, the former client,] had told the firm that if his settlement offer was not accepted by August 3, then he would file a malpractice action against the Doe law firm. The Doe law firm advised Mt. Airy that such an action could result in a judgment larger than the settlement offer and stated that it was in the firm's best interest for the offer to be accepted. In response, Mt. Airy sought to obtain the Doe law firm's consent to a written agreement that by paying Davison, Mt. Airy was not waiving any right to seek reimbursement from the firm if Mt. Airy should prevail in the declaratory judgment action regarding policy coverage. The Doe law firm refused to sign Mt. Airy's nonwaiver agreement, but further demanded that Mt. Airy pay the portion of the settlement offer above the firm's $5,000 deductible.

On August 8, 1994, Mt. Airy again requested the Doe law firm to sign the nonwaiver agreement, but the firm refused. Mt. Airy informed the Doe law

firm that it would fund the settlement with Davison, but that it intended to seek reimbursement from the firm. Thus, even though the Doe law firm would not sign the nonwaiver agreement with Mt. Airy, Mt. Airy paid $68,907.79 to fund the settlement with Davison. On the same day, Mt. Airy amended its complaint in the declaratory judgment action to seek a declaration that it was entitled to reimbursement from the Doe law firm for the money it provided to the firm to settle Davison's claim.

*Id.*

The Alabama Supreme Court ruled that the insurer was not entitled to reimbursement. It reaffirmed the principle that "where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demand of another, no action will lie to recover such a voluntary payment, in the absence of fraud, duress, or extortion." *Id.* at 537. The payment made by Mt. Airy was "voluntary," ruled the Alabama Supreme Court, despite the fact that it was made under protest and arguably made due to the threat of a bad-faith suit. *See id.* at 537–38. The court did suggest that *perhaps* an insurer could preserve the right of reimbursement if it "obtain[ed] either a written agreement with its insured that it does not waive such a right by making the payment, or obtain[ed] a court order granting the insurer the authority to participate in the settlement without waiving any right to reimbursement." *Id.* at 538. Mt. Airy had done neither.

*Mt. Airy* strongly suggests that the Alabama Supreme Court, if faced with the question of whether James River is entitled to reimbursement from Arlington, would answer "no." It's true that *Mt. Airy* concerned a question of coverage (that is, the duty to indemnify) and not the duty to defend, but that difference seems immate-

rial. The basic scenario in that case is the same as in this case: the insured invokes a contractual right to performance by the insurer; the insurer agrees to perform but expresses doubts about whether it is in fact required to perform; the insurer performs—that is, expends money on behalf of or to the insured; a court later determines that there was no duty to perform. The Alabama rule concerning "voluntary" payments would seem to apply equally to both cases.

Moreover, James River never obtained a written agreement from Arlington allowing it to retain a right to reimbursement, nor did it obtain a court order giving it such authority. Even assuming that the Alabama Supreme Court would recognize that an insurer could retain the right to reimbursement by employing one of these mechanisms, neither was employed here.

In short, this Court predicts, based on *Mt. Airy* specifically and the Alabama rule concerning "voluntary" payments more generally, that the Alabama Supreme Court would not allow James River to be reimbursed under these circumstances.

## C

■ There is thus a "true conflict" of laws here, and it is necessary to determine which state's law applies to this issue. Under Florida choice-of-law rules, "questions related to the manner or method of performance under a contract are determined by the law of the place of performance." *Higgins v. W. Bend Mut. Ins. Co.*, 85 So.3d 1156, 1158 (Fla. 5th DCA 2012) (citing *Gov't Emps. Ins. Co. v. Grounds*, 332 So.2d 13, 14–15 (1976) (per curiam)). As noted earlier, "[q]uestions bearing on the interpretation, validity, and obligation of contracts are substantive and governed by the rule of *lex loci contractus.*" *Id.* (citing *Goodman v. Olsen*, 305 So.2d 753, 755 (Fla.1974)).

■ The question is whether James River's conduct goes more to performance under the contract or construction of the contract. This Court finds that it goes to performance, for two reasons.

■ First, there is the Florida case law concerning bad-faith actions. Under controlling Florida precedent, an action brought by an insured against his insurer for bad-faith conduct in providing a defense goes to performance. *See id.* at 1159. In this case, that means that if James River had provided an inadequate defense or otherwise acted improperly in providing a defense, and Arlington had later sued James River for bad faith, the law of the state of performance would have controlled the question of whether James River had acted in bad faith. When making the decision how to defend, then, James River would have had to conform its conduct to the law of the place of performance. This suggests that the legal effect of the choices it made in defending the underlying action—including its reservation of rights—should be treated as going to performance and analyzed under the law of the state of performance.

■ Second, there is the more general principle that the question of *how* the insurer has undertaken its defense—rather than whether it had a duty to undertake a defense at all—goes to performance rather than construction of the contract. *Cf., e.g., Cent. Power Sys. & Servs., Inc. v. Universal Underwriters Ins. Co.*, 49 Kan.App.2d 958, 319 P.3d 562, 567 (2014) ("In our case, Zurich and Universal Underwriters did not perform *at all* under any duty to defend Central Power .... So what's at issue is mostly whether they were obligated to perform *at all*, not some specific aspect of how the insurers should have carried out their duty to defend. That's the very substance of the contractual obligation, which [Kansas choice-of-law principles] deter-

mines under the law of the place of contracting.").

 Under Florida choice-of-law principles, the law of the state of performance governs the question of whether James River's reservation of rights is effective. The law of the state of performance is Florida, where the underlying suit took place. *Cf. Gov't Emps. Ins. Co. v. Grounds*, 332 So.2d 13, 15 (Fla.1976) (per curiam) (place of performance in third-party bad-faith action is state where underlying suit took place). Therefore, Florida law controls, and, as discussed above, Florida law allows James River to recover its fees and costs. Accordingly, James River's motion for summary judgment is granted, and Arlington's motion is denied.

## VI

Despite all the choice-of-law issues, this case is really rather simple: James River agreed to indemnify and defend Arlington for property damage and personal injury, not fraud. Upon being asked to defend Arlington in state court, it expressed serious—and, as it turns out, well-founded—doubts about its contractual duties but nonetheless provided a defense, reserving the right to be reimbursed for that defense if it turned out that it had no such duty. That reservation of rights must be enforced under Florida law.

For the reasons stated,

**IT IS ORDERED:**

1. The Arlington Defendants' Amended Motion for Partial Summary Judgment, ECF No. 65, is **DENIED.**

2. Defendant Campus Edge's Motion for Summary Judgment, ECF No. 67, is **GRANTED.**

3. Campus Edge is dismissed as a party to this suit.

4. James River's Motion for Final Summary Judgment, ECF No. 73, is **GRANTED.**

5. This Court finds and declares that James River Insurance Company does not owe Arlington Pebble Creek, LLC, or Arlington Properties, Inc., any duty to defend or indemnify in Case No. 2012-CA-94 in the Circuit Court, Eighth Judicial Circuit, in and for Alachua County, Florida, under the terms of Policy Number 00006931-1.

6. James River is entitled to recover the costs incurred in defending Arlington in the underlying lawsuit.

7. The Arlington Defendants' Renewed Motion to Dismiss, ECF No. 75, is **DENIED.**

8. Not later than 14 days from the date of this order, the parties must submit a joint status report informing the Court how they intend to proceed in resolving any remaining disputed issues, including the amount of costs that James River is entitled to recover.

**SO ORDERED on May 22, 2016.**